Summary
1/28/2016 1:19:58 PM

Differences exist between documents.

**New Document:**
14-840
48 pages (321 KB)
1/28/2016 1:19:53 PM
Used to display results.

**Old Document:**
14-840_k537
48 pages (262 KB)
1/28/2016 1:19:53 PM

Get started: first change is on page 45.

No pages were deleted

**How to read this report**

Highlight indicates a change.
Deleted indicates deleted content.
▲ indicates pages were changed.
↔ indicates pages were moved.

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FEDERAL ENERGY REGULATORY COMMISSION *v.* ELECTRIC POWER SUPPLY ASSOCIATION ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT*

No. 14–840.   Argued October 14, 2015—Decided January 25, 2016

The Federal Power Act (FPA) authorizes the Federal Energy Regulatory Commission (FERC) to regulate "the sale of electric energy at wholesale in interstate commerce," including both wholesale electricity rates and any rule or practice "affecting" such rates. 16 U. S. C. §§824(b), 824d(a), 824e(a). But it places beyond FERC's power, leaving to the States alone, the regulation of "any other sale"—*i.e.*, any retail sale—of electricity. §824(b).

In an increasingly competitive interstate electricity market, FERC has undertaken to ensure "just and reasonable" wholesale rates, §824d(a), by encouraging the creation of nonprofit entities to manage regions of the nationwide electricity grid. These wholesale market operators administer their portions of the grid to ensure that the network conducts electricity reliably, and each holds competitive auctions to set wholesale prices. These auctions balance supply and demand continuously by matching bids to provide electricity from generators with orders from utilities and other "load-serving entities" (LSEs) that buy power at wholesale for resale to users. All bids to supply electricity are stacked from lowest to highest, and accepted in that order until all requests for power have been met. Every electricity supplier is paid the price of the highest-accepted bid, known as the locational marginal price (LMP).

In periods of high electricity demand, prices can reach extremely

———————

*Together with No. 14–841, *EnerNOC, Inc., et al.* v. *Electric Power Supply Association et al.,* also on certiorari to the same court.

high levels as the least efficient generators have their supply bids accepted in the wholesale market auctions. Not only do rates rise dramatically during these peak periods, but the increased flow of electricity threatens to overload the grid and cause substantial service problems. Faced with these challenges, wholesale market operators devised wholesale demand response programs, which pay consumers for commitments to reduce their use of power during these peak periods. Just like bids to supply electricity, offers from aggregators of multiple users of electricity or large individual consumers to reduce consumption can be bid into the wholesale market auctions. When it costs less to pay consumers to refrain from using power than it does to pay producers to supply more of it, demand response can lower these wholesale prices and increase grid reliability. Wholesale operators began integrating these programs into their markets some 15 years ago and FERC authorized their use. Congress subsequently encouraged further development of demand response.

Spurred on by Congress, FERC issued Order No. 719, which, among other things, requires wholesale market operators to receive demand response bids from aggregators of electricity consumers, except when the state regulatory authority overseeing those users' retail purchases bars demand response participation. 18 CFR §35.28(g)(1). Concerned that the order had not gone far enough, FERC then issued the rule under review here, Order No. 745. §35.28(g)(1)(v) (Rule). It requires market operators to pay the same price to demand response providers for conserving energy as to generators for producing it, so long as a "net benefits test," which ensures that accepted bids actually save consumers money, is met. The Rule rejected an alternative compensation scheme that would have subtracted from LMP the savings consumers receive from not buying electricity in the retail market, a formula known as LMP-G. The Rule also rejected claims that FERC lacked statutory authority to regulate the compensation operators pay for demand response bids.

The Court of Appeals for the District of Columbia Circuit vacated the Rule, holding that FERC lacked authority to issue the order because it directly regulates the retail electricity market, and holding in the alternative that the Rule's compensation scheme is arbitrary and capricious under the Administrative Procedure Act.

*Held*:

1. The FPA provides FERC with the authority to regulate wholesale market operators' compensation of demand response bids. The Court's analysis proceeds in three parts. First, the practices at issue directly affect wholesale rates. Second, FERC has not regulated retail sales. Taken together, these conclusions establish that the Rule complies with the FPA's plain terms. Third, the contrary view would

conflict with the FPA's core purposes. Pp. 14–29.

(a) The practices at issue directly affect wholesale rates. The FPA has delegated to FERC the authority—and, indeed, the duty—to ensure that rules or practices "affecting" wholesale rates are just and reasonable. §§824d(a), 824e(a). To prevent the statute from assuming near-infinite breadth, see *e.g., New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 655, this Court adopts the D. C. Circuit's common-sense construction limiting FERC's "affecting" jurisdiction to rules or practices that "*directly* affect the [wholesale] rate," *California Independent System Operator Corp.* v. *FERC*, 372 F. 3d 395, 403 (emphasis added). That standard is easily met here. Wholesale demand response is all about reducing wholesale rates; so too the rules and practices that determine how those programs operate. That is particularly true here, as the formula for compensating demand response necessarily lowers wholesale electricity prices by displacing higher-priced generation bids. Pp. 14–17.

(b) The Rule also does not regulate retail electricity sales in violation of §824(b). A FERC regulation does not run afoul of §824(b)'s proscription just because it affects the quantity or terms of retail sales. Transactions occurring on the wholesale market have natural consequences at the retail level, and so too, of necessity, will FERC's regulation of those wholesale matters. That is of no legal consequence. See, *e.g., Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore*, 487 U. S. 354, 365, 370–373. When FERC regulates what takes place on the wholesale market, as part of carrying out its charge to improve how that market runs, then no matter the effect on retail rates, §824(b) imposes no bar. Here, every aspect of FERC's regulatory plan happens exclusively on the wholesale market and governs exclusively that market's rules. The Commission's justifications for regulating demand response are likewise only about improving the wholesale market. Cf. *Oneok, Inc.* v. *Learjet, Inc.*, 575 U. S. \_\_\_, \_\_\_. Pp. 17–25.

(c) In addition, EPSA's position would subvert the FPA. EPSA's arguments suggest that the entire practice of wholesale demand response falls outside what FERC can regulate, and EPSA concedes that States also lack that authority. But under the FPA, wholesale demand response programs could not go forward if no entity had jurisdiction to regulate them. That outcome would flout the FPA's core purposes of protecting "against excessive prices" and ensuring effective transmission of electric power. *Pennsylvania Water & Power Co.* v. *FPC*, 343 U. S. 414, 418; see *Gulf States Util. Co.* v. *FPC*, 411 U. S. 747, 758. The FPA should not be read, against its clear terms, to halt a practice that so evidently enables FERC to fulfill its statutory du-

ties of holding down prices and enhancing reliability in the wholesale energy market. Pp. 25–29.

2. FERC's decision to compensate demand response providers at LMP—the same price paid to generators—instead of at LMP-G, is not arbitrary and capricious. Under the narrow scope of review in *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43, this Court's important but limited role is to ensure that FERC engaged in reasoned decisionmaking—that it weighed competing views, selected a compensation formula with adequate support in the record, and intelligibly explained the reasons for making that decision. Here, FERC provided a detailed explanation of its choice of LMP and responded at length to contrary views. FERC's serious and careful discussion of the issue satisfies the arbitrary and capricious standard. Pp. 29–33.

753 F. 3d 216, reversed and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. SCALIA, J. filed a dissenting opinion, in which THOMAS, J., joined. ALITO, J., took no part in the consideration or decision of the cases.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 14–840 and 14–841

_____

## FEDERAL ENERGY REGULATORY COMMISSION, PETITIONER
14–840  *v.*
## ELECTRIC POWER SUPPLY ASSOCIATION, ET AL.

## ENERNOC, INC., ET AL., PETITIONERS
14–841  *v.*
## ELECTRIC POWER SUPPLY ASSOCIATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[January 25, 2016]

JUSTICE KAGAN delivered the opinion of the Court.

The Federal Power Act (FPA or Act), 41 Stat. 1063, as amended, 16 U. S. C. §791a *et seq.,* authorizes the Federal Energy Regulatory Commission (FERC or Commission) to regulate "the sale of electric energy at wholesale in interstate commerce," including both wholesale electricity rates and any rule or practice "affecting" such rates. §§824(b), 824e(a). But the law places beyond FERC's power, and leaves to the States alone, the regulation of "any other sale"—most notably, any retail sale—of electricity. §824(b). That statutory division generates a steady flow of jurisdictional disputes because—in point of fact if not of law—the wholesale and retail markets in electricity are inextricably linked.

These cases concern a practice called "demand re-

sponse," in which operators of wholesale markets pay electricity consumers for commitments *not* to use power at certain times. That practice arose because wholesale market operators can sometimes—say, on a muggy August day—offer electricity both more cheaply and more reliably by paying users to dial down their consumption than by paying power plants to ramp up their production. In the regulation challenged here, FERC required those market operators, in specified circumstances, to compensate the two services equivalently—that is, to pay the same price to demand response providers for conserving energy as to generators for making more of it.

Two issues are presented here. First, and fundamentally, does the FPA permit FERC to regulate these demand response transactions at all, or does any such rule impinge on the States' authority? Second, even if FERC has the requisite statutory power, did the Commission fail to justify adequately why demand response providers and electricity producers should receive the same compensation? The court below ruled against FERC on both scores. We disagree.

I

A

Federal regulation of electricity owes its beginnings to one of this Court's decisions. In the early 20th century, state and local agencies oversaw nearly all generation, transmission, and distribution of electricity. But this Court held in *Public Util. Comm'n of R. I.* v. *Attleboro Steam & Elec. Co.*, 273 U. S. 83, 89–90 (1927), that the Commerce Clause bars the States from regulating certain interstate electricity transactions, including wholesale sales (*i.e.*, sales for resale) across state lines. That ruling created what became known as the "*Attleboro* gap"—a regulatory void which, the Court pointedly noted, only Congress could fill. See *id.,* at 90.

Congress responded to that invitation by passing the FPA in 1935. The Act charged FERC's predecessor agency with undertaking "effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." *New York* v. *FERC*, 535 U. S. 1, 6 (2002) (quoting *Gulf States Util. Co.* v. *FPC,* 411 U. S. 747, 758 (1973)). Under the statute, the Commission has authority to regulate "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." 16 U. S. C. §824(b)(1).

In particular, the FPA obligates FERC to oversee all prices for those interstate transactions and all rules and practices affecting such prices. The statute provides that "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with" interstate transmissions or wholesale sales—as well as "all rules and regulations affecting or pertaining to such rates or charges"—must be "just and reasonable." §824d(a). And if "any rate [or] charge," or "any rule, regulation, practice, or contract affecting such rate [or] charge[,]" falls short of that standard, the Commission must rectify the problem: It then shall determine what is "just and reasonable" and impose "the same by order." §824e(a).

Alongside those grants of power, however, the Act also limits FERC's regulatory reach, and thereby maintains a zone of exclusive state jurisdiction. As pertinent here, §824(b)(1)—the same provision that gives FERC authority over wholesale sales—states that "this subchapter," including its delegation to FERC, "shall not apply to any other sale of electric energy." Accordingly, the Commission may not regulate either within-state wholesale sales or, more pertinent here, retail sales of electricity (*i.e.*, sales directly to users). See *New York*, 535 U. S., at 17, 23. State utility commissions continue to oversee those transactions.

Since the FPA's passage, electricity has increasingly become a competitive interstate business, and FERC's role has evolved accordingly. Decades ago, state or local utilities controlled their own power plants, transmission lines, and delivery systems, operating as vertically integrated monopolies in confined geographic areas. That is no longer so. Independent power plants now abound, and almost all electricity flows not through "the local power networks of the past," but instead through an interconnected "grid" of near-nationwide scope. See *id.*, at 7 ("electricity that enters the grid immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce," linking producers and users across the country). In this new world, FERC often forgoes the cost-based rate-setting traditionally used to prevent monopolistic pricing. The Commission instead undertakes to ensure "just and reasonable" wholesale rates by enhancing competition— attempting, as we recently explained, "to break down regulatory and economic barriers that hinder a free market in wholesale electricity." *Morgan Stanley Capital Group Inc.* v. *Public Util. Dist. No. 1 of Snohomish Cty.*, 554 U. S. 527, 536 (2008).

As part of that effort, FERC encouraged the creation of nonprofit entities to manage wholesale markets on a regional basis. Seven such wholesale market operators now serve areas with roughly two-thirds of the country's electricity "load" (an industry term for the amount of electricity used). See FERC, Energy Primer: A Handbook of Energy Market Basics 58–59 (Nov. 2015) (Energy Primer). Each administers a portion of the grid, providing generators with access to transmission lines and ensuring that the network conducts electricity reliably. See *ibid.* And still more important for present purposes, each operator conducts a competitive auction to set wholesale prices for electricity.

These wholesale auctions serve to balance supply and

demand on a continuous basis, producing prices for electricity that reflect its value at given locations and times throughout each day. Such a real-time mechanism is needed because, unlike most products, electricity cannot be stored effectively. Suppliers must generate—every day, hour, and minute—the exact amount of power necessary to meet demand from the utilities and other "load-serving entities" (LSEs) that buy power at wholesale for resale to users. To ensure that happens, wholesale market operators obtain (1) orders from LSEs indicating how much electricity they need at various times and (2) bids from generators specifying how much electricity they can produce at those times and how much they will charge for it. Operators accept the generators' bids in order of cost (least expensive first) until they satisfy the LSEs' total demand. The price of the last unit of electricity purchased is then paid to every supplier whose bid was accepted, regardless of its actual offer; and the total cost is split among the LSEs in proportion to how much energy they have ordered. So, for example, suppose that at 9 a.m. on August 15 four plants serving Washington, D. C. can each produce some amount of electricity for, respectively, \$10/unit, \$20/unit, \$30/unit, and \$40/unit. And suppose that LSEs' demand at that time and place is met after the operator accepts the three cheapest bids. The first three generators would then all receive \$30/unit. That amount is (think back to Econ 101) the marginal cost—*i.e.,* the added cost of meeting another unit of demand—which is the price an efficient market would produce. See 1 A. Kahn, The Economics of Regulation: Principles and Institutions 65–67 (1988). FERC calls that cost (in jargon that will soon become oddly familiar) the locational marginal price, or LMP.[1]

_____

[1] To be more precise, LMP generally includes, in addition to the price of the highest-accepted bid, certain costs of moving power through the

As in any market, when wholesale buyers' demand for electricity increases, the price they must pay rises correspondingly; and in those times of peak load, the grid's reliability may also falter. Suppose that by 2 p.m. on August 15, it is 98 degrees in D. C. In every home, store, or office, people are turning the air conditioning up. To keep providing power to their customers, utilities and other LSEs must ask their market operator for more electricity. To meet that spike in demand, the operator will have to accept more expensive bids from suppliers. The operator, that is, will have to agree to the $40 bid that it spurned before—and maybe, beyond that, to bids of $50 or $60 or $70. In such periods, operators often must call on extremely inefficient generators whose high costs of production cause them to sit idle most of the time. See Energy Primer 41–42. As that happens, LMP—the price paid by *all* LSEs to *all* suppliers—climbs ever higher. And meanwhile, the increased flow of electricity through the grid threatens to overload transmission lines. See *id.,* at 44. As every consumer knows, it is just when the weather is hottest and the need for air conditioning most acute that blackouts, brownouts, and other service problems tend to occur.

Making matters worse, the wholesale electricity market lacks the self-correcting mechanism of other markets. Usually, when the price of a product rises, buyers naturally adjust by reducing how much they purchase. But consumers of electricity—and therefore the utilities and other LSEs buying power for them at wholesale—do not respond to price signals in that way. To use the economic term, demand for electricity is inelastic. That is in part because electricity is a necessity with few ready substitutes: When the temperature reaches 98 degrees, many people see no

grid. But those costs are not relevant here, and we therefore disregard them.

option but to switch on the AC. And still more: Many State regulators insulate consumers from short-term fluctuations in wholesale prices by insisting that LSEs set stable retail rates. See *id.,* at 41, 43–44. That, one might say, short-circuits the normal rules of economic behavior. Even in peak periods, as costs surge in the wholesale market, consumers feel no pinch, and so keep running the AC as before. That means, in turn, that LSEs must keep buying power to send to those users—no matter that wholesale prices spiral out of control and increased usage risks overtaxing the grid.

But what if there were an alternative to that scenario? Consider what would happen if wholesale market operators could induce consumers to refrain from using (and so LSEs from buying) electricity during peak periods. Whenever doing that costs less than adding more power, an operator could bring electricity supply and demand into balance at a lower price. And simultaneously, the operator could ease pressure on the grid, thus protecting against system failures. That is the idea behind the practice at issue here: Wholesale demand response, as it is called, pays consumers for commitments to curtail their use of power, so as to curb wholesale rates and prevent grid breakdowns. See *id.,* at 44–46.[2]

These demand response programs work through the operators' regular auctions. Aggregators of multiple users of electricity, as well as large-scale individual users like factories or big-box stores, submit bids to decrease electricity consumption by a set amount at a set time for a set price. The wholesale market operators treat those offers just like bids from generators to increase supply. The

_____

[2] Differently designed demand response programs can operate in retail markets. Some States, for example, either encourage or require utilities to offer "critical-peak rebates" to customers for curtailing electricity use at times of high load. See Energy Primer 45.

operators, that is, rank order all the bids—both to produce and to refrain from consuming electricity—from least to most expensive, and then accept the lowest bids until supply and demand come into equipoise. And, once again, the LSEs pick up the cost of all those payments. So, to return to our prior example, if a store submitted an offer *not* to use a unit of electricity at 2 p.m. on August 15 for $35, the operator would accept that bid before calling on the generator that offered to produce a unit of power for $40. That would result in a lower LMP—again, wholesale market price—than if the market operator could not avail itself of demand response pledges. See ISO/RTO Council, Harnessing the Power of Demand: How ISOs and RTOs Are Integrating Demand Response Into Wholesale Electricity Markets 40–43 (2007) (estimating that, in one market, a demand response program reducing electricity usage by 3% in peak hours would lead to price declines of 6% to 12%). And it would decrease the risk of blackouts and other service problems.

Wholesale market operators began using demand response some 15 years ago, soon after they assumed the role of overseeing wholesale electricity sales. Recognizing the value of demand response for both system reliability and efficient pricing, they urged FERC to allow them to implement such programs. See, *e.g., PJM Interconnection, L. L. C.,* Order Accepting Tariff Sheets as Modified, 95 FERC ¶61,306 (2001); *California Independent System Operator Corp.*, Order Conditionally Accepting for Filing Tariff Revisions, 91 FERC ¶61,256 (2000). And as demand response went into effect, market participants of many kinds came to view it—in the words of respondent Electric Power Supply Association (EPSA)—as an "important element[ ] of robust, competitive wholesale electricity markets." App. 94, EPSA, Comments on Proposed Rule on Demand Response Compensation in Organized Wholesale Energy Markets (May 12, 2010).

Congress added to the chorus of voices praising wholesale demand response. In the Energy Policy Act of 2005, 119 Stat. 594 (EPAct), it declared as "the policy of the United States" that such demand response "shall be encouraged." §1252(f), 119 Stat. 966, 16 U. S. C. §2642 note. In particular, Congress directed, the deployment of "technology and devices that enable electricity customers to participate in . . . demand response systems shall be facilitated, and unnecessary barriers to demand response participation in energy . . . markets shall be eliminated." *Ibid.*[3]

B

Spurred on by Congress, the Commission determined to take a more active role in promoting wholesale demand response programs. In 2008, FERC issued Order No. 719, which (among other things) requires wholesale market operators to receive demand response bids from aggregators of electricity consumers, except when the state regulatory authority overseeing those users' retail purchases bars such demand response participation. See 73 Fed. Reg. 64119, ¶154 (codified 18 CFR §35.28(g)(1) (2015)). That original order allowed operators to compensate demand response providers differently from generators if they so chose. No party sought judicial review.

---

[3] The dissent misreads this subsection of the EPAct in suggesting that it encourages States' use of retail demand response, rather than the wholesale programs at issue here. See *post,* at 8–9 (opinion of SCALIA, J.); n. 2, *supra.* The prior subsection, §1252(e), as the dissent notes, promotes demand response in the States—but then the EPAct switches gears. Subsection (f) expressly addresses the programs of "regional electricity entit[ies]"—that is, wholesale market operators. Indeed, the provision lists all the markets those operators run: not just the electricity market involved here, but also the "capacity and ancillary service markets." Those are established components of the wholesale system with no counterparts at the state level. See Energy Primer 59.

Concerned that Order No. 719 had not gone far enough, FERC issued the rule under review here in 2011, with one commissioner dissenting. See *Demand Response Competition in Organized Wholesale Energy Markets*, Order No. 745, 76 Fed. Reg. 16658 (Rule) (codified 18 CFR §35.28(g)(1)(v)). The Rule attempts to ensure "just and reasonable" wholesale rates by requiring market operators to appropriately compensate demand response providers and thus bring about "meaningful demand-side participation" in the wholesale markets. 76 Fed. Reg. 16658, ¶1, 16660, ¶10; 16 U. S. C. §824d(a). The Rule's most significant provision directs operators, under two specified conditions, to pay LMP for any accepted demand response bid, just as they do for successful supply bids. See 76 Fed. Reg. 16666–16669, ¶¶45–67. In other words, the Rule requires that demand response providers in those circumstances receive as much for conserving electricity as generators do for producing it.

The two specified conditions ensure that a bid to use less electricity provides the same value to the wholesale market as a bid to make more. First, a demand response bidder must have "the capability to provide the service" offered; it must, that is, actually be able to reduce electricity use and thereby obviate the operator's need to secure additional power. *Id.,* at 16666, ¶¶48–49. Second, paying LMP for a demand response bid "must be cost-effective," as measured by a standard called "the net benefits test." *Ibid.*, ¶48. That test makes certain that accepting a lower-priced demand response bid over a higher-priced supply bid will actually save LSEs (*i.e.*, wholesale purchasers) money. In some situations it will not, even though accepting a lower-priced bid (by definition) reduces LMP. That is because (to oversimplify a bit) LSEs share the cost of paying successful bidders, and reduced electricity use makes some LSEs drop out of the market, placing a proportionally greater burden on those that are left. Each

remaining LSE may thus wind up paying more even though the total bill is lower; or said otherwise, the costs associated with an LSE's increased share of compensating bids may exceed the savings that the LSE obtains from a lower wholesale price.[4]  The net benefits test screens out such counterproductive demand response bids, exempting them from the Rule's compensation requirement.  See *id.,* at 16659, 16666–16667, ¶¶3, 50–53.  What remains are only those offers whose acceptance will result in actual savings to wholesale purchasers (along with more reliable service to end users).  See *id.,* at 16671, ¶¶78–80.

The Rule rejected an alternative scheme for compensating demand response bids.  Several commenters had urged that, in paying a demand response provider, an operator should subtract from the ordinary wholesale price the savings that the provider nets by not buying electricity on the retail market.  Otherwise, the commenters claimed, demand response providers would receive a kind of "double-payment" relative to generators.  See *id.,* at 16663, ¶24.  That proposal, which the dissenting commissioner largely accepted, became known as LMP minus G, or more simply LMP-G, where "G" stands for the retail price of electricity.  See *id.,* at 16668, ¶60, 16680 (Moeller, dissenting).  But FERC explained that, under the conditions it had specified, the value of an accepted demand response bid to the wholesale market is identical to that of an accepted supply bid because each succeeds in cost-effectively "balanc[ing] supply and demand."  *Id.,* at 16667, ¶55.  And, the Commission reasoned, that comparable value is

———————

[4] The explanation is a stylized version of the actual phenomenon.  In reality, LSEs rarely drop out of the market entirely because of demand response; instead, they will merely order less electricity.  But the effect is the same as in the text, because the total cost of accepted bids is spread among LSEs in proportion to the units of electricity they purchase; and as those units decline, each remaining one bears a greater share of the bill.

what ought to matter given FERC's goal of strengthening competition in the wholesale market: Rates should reflect not the costs that each market participant incurs, but instead the services it provides. See *id.,* at 16668, ¶62. Moreover, the Rule stated, compensating demand response bids at their actual value—*i.e.*, LMP—will help overcome various technological barriers, including a lack of needed infrastructure, that impede aggregators and large-scale users of electricity from fully participating in demand response programs. See *id.,* at 16667–16668, ¶¶57–58.

The Rule also responded to comments challenging FERC's statutory authority to regulate the compensation operators pay for demand response bids. Pointing to the Commission's analysis in Order No. 719, the Rule explained that the FPA gives FERC jurisdiction over such bids because they "directly affect[ ] wholesale rates." *Id.,* at 16676, ¶112 (citing 74 *id.*, at 37783, ¶47, and 18 U. S. C. §824d). Nonetheless, the Rule noted, FERC would continue Order No. 719's policy of allowing any state regulatory body to prohibit consumers in its retail market from taking part in wholesale demand response programs. See 76 Fed. Reg. 16676, ¶114; 73 *id.*, at 64119, ¶154. Accordingly, the Rule does not require any "action[ ] that would violate State laws or regulations." 76 *id.*, at 16676, ¶114.

C

A divided panel of the Court of Appeals for the District of Columbia Circuit vacated the Rule as "*ultra vires* agency action." 753 F. 3d 216, 225 (2014). The court held that FERC lacked authority to issue the Rule even though "demand response compensation affects the wholesale market." *Id.,* at 221. The Commission's "jurisdiction to regulate practices 'affecting' rates," the court stated, "does not erase the specific limit[ ]" that the FPA imposes on

FERC's regulation of retail sales. *Id.,* at 222. And the Rule, the court concluded, exceeds that limit: In "luring . . . *retail* customers" into the wholesale market, and causing them to decrease "levels of *retail* electricity consumption," the Rule engages in "direct regulation of the retail market." *Id.,* at 223–224.

The Court of Appeals held, alternatively, that the Rule is arbitrary and capricious under the Administrative Procedure Act, 5 U. S. C. §706(2)(A), because FERC failed to "adequately explain[ ]" why paying LMP to demand response providers "results in just compensation." 753 F. 3d, at 225. According to the court, FERC did not "properly consider" the view that such a payment would give those providers a windfall by leaving them with "the full LMP *plus* . . . the savings associated with" reduced consumption. *Ibid.* (quoting *Demand Response Competition in Organized Wholesale Energy Markets: Order on Rehearing and Clarification*, Order No. 745–A (Rehearing Order), 137 FERC ¶61,215, p. 62,316 (2011) (Moeller, dissenting)). The court dismissed out of hand the idea that "comparable contributions [could] be the reason for equal compensation." 753 F. 3d, at 225.

Judge Edwards dissented. He explained that the rules governing wholesale demand response have a "direct effect . . . on wholesale electricity rates squarely within FERC's jurisdiction." *Id.,* at 227. And in setting those rules, he argued, FERC did not engage in "direct regulation of the retail market"; rather, "[a]uthority over retail rates . . . remains vested solely in the States." *Id.,* at 234 (internal quotation marks omitted). Finally, Judge Edwards rejected the majority's view that the Rule is arbitrary and capricious. He noted the substantial deference due to the Commission in cases involving ratemaking, and concluded that FERC provided a "thorough" and "reasonable" explanation for choosing LMP as the appropriate compensation formula. *Id.,* at 236–238.

We granted certiorari, 575 U. S. ___ (2015), to decide whether the Commission has statutory authority to regulate wholesale market operators' compensation of demand response bids and, if so, whether the Rule challenged here is arbitrary and capricious. We now hold that the Commission has such power and that the Rule is adequately reasoned. We accordingly reverse.

## II

Our analysis of FERC's regulatory authority proceeds in three parts. First, the practices at issue in the Rule— market operators' payments for demand response commitments—directly affect wholesale rates. Second, in addressing those practices, the Commission has not regulated retail sales. Taken together, those conclusions establish that the Rule complies with the FPA's plain terms. And third, the contrary view would conflict with the Act's core purposes by preventing all use of a tool that no one (not even EPSA) disputes will curb prices and enhance reliability in the wholesale electricity market.[5]

## A

The FPA delegates responsibility to FERC to regulate the interstate wholesale market for electricity—both wholesale rates and the panoply of rules and practices affecting them. As noted earlier, the Act establishes a scheme for federal regulation of "the sale of electric energy at wholesale in interstate commerce." 16 U. S. C. §824(b)(1); see *supra,* at 3. Under the statute, "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with" interstate wholesale sales "shall be just and reasonable"; so too shall "all rules and

---

[5] Because we think FERC's authority clear, we need not address the Government's alternative contention that FERC's interpretation of the statute is entitled to deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984).

regulations affecting or pertaining to such rates or charges." §824d(a). And if FERC sees a violation of that standard, it must take remedial action. More specifically, whenever the Commission "shall find that any rate [or] charge"—or "any rule, regulation, practice, or contract affecting such rate [or] charge"—is "unjust [or] unreasonable," then the Commission "shall determine the just and reasonable rate, charge[,] rule, regulation, practice or contract" and impose "the same by order." §824e(a). That means FERC has the authority—and, indeed, the duty—to ensure that rules or practices "affecting" wholesale rates are just and reasonable.

Taken for all it is worth, that statutory grant could extend FERC's power to some surprising places. As the court below noted, markets in all electricity's inputs—steel, fuel, and labor most prominent among them—might affect generators' supply of power. See 753 F. 3d, at 221; *id.,* at 235 (Edwards, J., dissenting). And for that matter, markets in just about everything—the whole economy, as it were—might influence LSEs' demand. So if indirect or tangential impacts on wholesale electricity rates sufficed, FERC could regulate now in one industry, now in another, changing a vast array of rules and practices to implement its vision of reasonableness and justice. We cannot imagine that was what Congress had in mind.

For that reason, an earlier D. C. Circuit decision adopted, and we now approve, a common-sense construction of the FPA's language, limiting FERC's "affecting" jurisdiction to rules or practices that "*directly* affect the [wholesale] rate." *California Independent System Operator Corp.* v. *FERC*, 372 F. 3d 395, 403 (2004) (emphasis added); see 753 F. 3d, at 235 (Edwards, J., dissenting). As we have explained in addressing similar terms like "relating to" or "in connection with," a non-hyperliteral reading is needed to prevent the statute from assuming near-infinite breadth. See *New York State Conference of Blue Cross &*

*Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 655
(1995) ("If 'relate to' were taken to extend to the furthest
stretch of its indeterminacy, then for all practical purposes
[the statute] would never run its course"); *Maracich* v.
*Spears*, 570 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 9) ("The
phrase 'in connection with' is essentially indeterminat[e]
because connections, like relations, stop nowhere" (inter-
nal quotation marks omitted)). The Commission itself
incorporated the D. C. Circuit's standard in addressing its
authority to issue the Rule. See 76 Fed. Reg. 16676, ¶112
(stating that FERC has jurisdiction because wholesale
demand response "directly affects wholesale rates"). We
think it right to do the same.

Still, the rules governing wholesale demand response
programs meet that standard with room to spare. In
general (and as earlier described), wholesale market oper-
ators employ demand response bids in competitive auc-
tions that balance wholesale supply and demand and
thereby set wholesale prices. See *supra*, at 7–8. The
operators accept such bids if and only if they bring down
the wholesale rate by displacing higher-priced generation.
And when that occurs (most often in peak periods), the
easing of pressure on the grid, and the avoidance of service
problems, further contributes to lower charges. See Brief
for Grid Engineers et al. as *Amici Curiae* 26–27. Whole-
sale demand response, in short, is all about reducing
wholesale rates; so too, then, the rules and practices that
determine how those programs operate.

And that is particularly true of the formula that opera-
tors use to compensate demand response providers. As in
other areas of life, greater pay leads to greater participa-
tion. If rewarded at LMP, rather than at some lesser
amount, more demand response providers will enter more
bids capable of displacing generation, thus necessarily
lowering wholesale electricity prices. Further, the Com-
mission found, heightened demand response participation

will put "downward pressure" on generators' own bids, encouraging power plants to offer their product at reduced prices lest they come away empty-handed from the bidding process. 76 Fed. Reg. 16660, ¶10. That, too, ratchets down the rates wholesale purchasers pay. Compensation for demand response thus directly affects wholesale prices. Indeed, it is hard to think of a practice that does so more.

### B

The above conclusion does not end our inquiry into the Commission's statutory authority; to uphold the Rule, we also must determine that it does not regulate *retail* electricity sales. That is because, as earlier described, §824(b) "limit[s] FERC's sale jurisdiction to that at wholesale," reserving regulatory authority over retail sales (as well as intrastate wholesale sales) to the States. *New York*, 535 U. S., at 17 (emphasis deleted); see 16 U. S. C. §824(b); *supra,* at 3.[6] FERC cannot take an action transgressing that limit no matter how direct, or dramatic, its impact on wholesale rates. Suppose, to take a far-fetched example, that the Commission issued a regulation compelling every consumer to buy a certain amount of electricity on the retail market. Such a rule would necessarily determine

––––––––––

[6] EPSA additionally cites §824(a) as constraining the Commission's authority, see Brief for Respondent EPSA et al. 25, 31, 43 (Brief for Respondents), but that provision adds nothing to the analysis. Section 824(a), the FPA's "declaration of policy," states that federal regulation of electricity is to "extend only to those matters which are not subject to regulation by the States." We have often explained that this declaration serves only to frame the Act's basic structure and purpose. See, *e.g., New York*, 535 U. S., at 22 (Section 824(a) "broadly expresse[s] [the Act's] purpose" (quoting *FPC* v. *Southern Cal. Edison Co.*, 376 U. S. 205, 215 (1964)); *id.,* at 215 (Section 824(a) is "merely a 'policy declaration . . . of great generality'" (quoting *Connecticut Light & Power Co.* v. *FPC*, 324 U. S. 515, 527 (1945))). That means, as applied to the issue here, that §824(a) merely points toward the division of regulatory authority that §824(b) carries out. The operative provision is what counts.

the load purchased on the wholesale market too, and thus would alter wholesale prices. But even given that ineluctable consequence, the regulation would exceed FERC's authority, as defined in §824(b), because it specifies terms of sale at retail—which is a job for the States alone.[7]

Yet a FERC regulation does not run afoul of §824(b)'s proscription just because it affects—even substantially— the quantity or terms of retail sales. It is a fact of economic life that the wholesale and retail markets in electricity, as in every other known product, are not hermetically sealed from each other. To the contrary, transactions that occur on the wholesale market have natural consequences at the retail level. And so too, of necessity, will FERC's regulation of those wholesale matters. Cf. *Oneok, Inc.* v. *Learjet, Inc.*, 575 U. S. ___, ___ (2015) (slip op., at 13) (noting that in the similarly structured world of natural gas regulation, a "Platonic ideal" of strict separation be-

_____

[7]The dissent disputes this framing of the issue, but its criticism (made by neither EPSA nor its *amici*) is irrelevant to deciding this case. According to the dissent, the FPA prohibits FERC from regulating not only retail sales of electricity (as we agree) but also any other sales of electricity aside from wholesale sales. See *post,* at 2–4. But the dissent turns out not to argue that the Rule regulates some kind of non-retail, non-wholesale sale of electric energy (whatever that might be). Rather, the dissent claims that the Rule regulates retail sales, see *post,* at 4– 6—exactly the point that we address, and reject, in the following pages. And in any event, the dissent's framing of the issue is wrong if and to the extent it posits some undefined category of other electricity sales falling within neither FERC's nor the States' regulatory authority. Sales of electric energy come in two varieties: wholesale and retail. The very case the dissent relies on recognizes that fact by referring to "other sales, that is, to direct sales for consumptive use." *Panhandle Eastern Pipe Line Co.* v. *Public Serv. Comm'n of Ind.*, 332 U. S. 507, 516 (1947). FERC regulates interstate wholesale sales of electricity; the States regulate retail sales of electricity. And FERC may also regulate, as it did here, practices and rules affecting wholesale prices—that is, matters beyond wholesale sales themselves—so long as, in doing so, it does not trespass on the States' authority to regulate retail sales of electric power. See *supra,* at 3.

tween federal and state realms cannot exist). When FERC
sets a wholesale rate, when it changes wholesale market
rules, when it allocates electricity as between wholesale
purchasers—in short, when it takes virtually any action
respecting wholesale transactions—it has some effect, in
either the short or the long term, on retail rates. That is
of no legal consequence. See, *e.g., Mississippi Power &
Light Co.* v. *Mississippi ex rel. Moore*, 487 U. S. 354, 365,
370–373 (1988) (holding that an order regulating whole-
sale purchases fell within FERC's jurisdiction, and
preempted contrary state action, even though it clearly
affected retail prices); *Nantahala Power & Light Co.* v.
*Thornburg*, 476 U. S. 953, 959–961, 970 (1986) (same);
*FPC* v. *Louisiana Power & Light Co.*, 406 U. S. 621, 636–
641 (1972) (holding similarly in the natural gas context).
When FERC regulates what takes place on the wholesale
market, as part of carrying out its charge to improve how
that market runs, then no matter the effect on retail rates,
§824(b) imposes no bar.

And in setting rules for demand response, that is all
FERC has done. The Commission's Rule addresses—and
addresses only—transactions occurring on the wholesale
market. Recall once again how demand response works—
and forgive the coming italics. See *supra,* at 7–8. *Whole-
sale* market operators administer the entire program,
receiving every demand response bid made. Those opera-
tors accept such a bid at the mandated price when (and
only when) the bid provides value to the *wholesale* market
by balancing supply and demand more "cost-
effective[ly]"—*i.e.,* at a lower cost to *wholesale* purchas-
ers—than a bid to generate power. 76 Fed. Reg. 16659,
16666, ¶2, 48. The compensation paid for a successful bid
(LMP) is whatever the operator's auction has determined
is the marginal price of *wholesale* electricity at a particu-
lar location and time. See *id.,* at 16659, ¶2. And those
footing the bill are the same *wholesale* purchasers that

have benefited from the lower *wholesale* price demand response participation has produced. See *id.*, at 16674, ¶¶99–100. In sum, whatever the effects at the retail level, every aspect of the regulatory plan happens exclusively on the wholesale market and governs exclusively that market's rules.

What is more, the Commission's justifications for regulating demand response are all about, and only about, improving the wholesale market. Cf. *Oneok,* 575 U. S., at ___ (slip op., at 11) (considering "the *target* at which [a] law *aims*" in determining whether a State is properly regulating retail or, instead, improperly regulating wholesale sales). In Order No. 719, FERC explained that demand response participation could help create a "well-functioning competitive wholesale electric energy market" with "reduce[d] wholesale power prices" and "enhance[d] reliability." 73 Fed. Reg. 64103, ¶16. And in the Rule under review, FERC expanded on that theme. It listed the several ways in which "demand response in organized wholesale energy markets can help improve the functioning and competitiveness of those markets": by replacing high-priced, inefficient generation; exerting "downward pressure" on "generator bidding strategies"; and "support[ing] system reliability." 76 *id.*, at 16660, ¶10; see Notice of Proposed Rulemaking for Order No. 745, 75 *id.*, at 15363–15364, ¶4 (2010) (noting similar aims); *supra,* at 7–8. FERC, that is, focused wholly on the benefits that demand response participation (in the wholesale market) could bring to the wholesale market. The retail market figures no more in the Rule's goals than in the mechanism through which the Rule operates.

EPSA's primary argument that FERC has usurped state power (echoed in the dissent) maintains that the Rule "effectively," even though not "nominal[ly]," regulates retail prices. See, *e.g.,* Brief for Respondents 1, 10, 23–27, 35–39; Tr. of Oral Arg. 26, 30; *post,* at 4–6. The argument

begins on universally accepted ground: Under §824(b), only the States, not FERC, can set retail rates. See, *e.g., FPC* v. *Conway Corp.*, 426 U. S. 271, 276 (1976). But as EPSA concedes, that tenet alone cannot make its case, because FERC's Rule does not set actual rates: States continue to make or approve all retail rates, and in doing so may insulate them from price fluctuations in the wholesale market. See Brief for Respondents 39. Still, EPSA contends, rudimentary economic analysis shows that the Rule does the "functional equivalen[t]" of setting—more particularly, of raising—retail rates. *Id.,* at 36. That is because the opportunity to make demand response bids in the wholesale market changes consumers' calculations. In deciding whether to buy electricity at retail, economically-minded consumers now consider *both* the cost of making such a purchase *and* the cost of forgoing a possible demand response payment. So, EPSA explains, if a factory can buy electricity for $10/unit, but can earn $5/unit for *not* buying power at peak times, then the effective retail rate at those times is $15/unit: the $10 the factory paid at retail plus the $5 it passed up. See *id.,* at 10. And by thus increasing effective retail rates, EPSA concludes, FERC trespasses on the States' ground.

The modifier "effective" is doing quite a lot of work in that argument—more work than any conventional understanding of rate-setting allows. The standard dictionary definition of the term "rate" (as used with reference to prices) is "[a]n amount paid or charged for a good or service." Black's Law Dictionary 1452 (10th ed. 2014); see, *e.g.,* 13 Oxford English Dictionary 208–209 (2d ed. 1989) ("rate" means "price," "cost," or "sum paid or asked for a . . . thing"). To set a retail electricity rate is thus to establish the amount of money a consumer will hand over in exchange for power. Nothing in §824(b) or any other part of the FPA suggests a more expansive notion, in which FERC sets a rate for electricity merely by altering con-

sumers' incentives to purchase that product.[8]  And neither does anything in this Court's caselaw.  Our decisions uniformly speak about rates, for electricity and all else, in only their most prosaic, garden-variety sense.  As the Solicitor General summarized that view, "the rate is what it is."  Tr. of Oral Arg. 7.  It is the price paid, not the price paid *plus* the cost of a forgone economic opportunity.

Consider a familiar scenario to see what is odd about EPSA's theory.  Imagine that a flight is overbooked.  The airline offers passengers $300 to move to a later plane that has extra seats.  On EPSA's view, that offer adds $300—the cost of not accepting the airline's proffered payment—to the price of every continuing passenger's ticket.  So a person who originally spent $400 for his ticket, and decides to reject the airline's proposal, paid an "effective" price of $700.  But would any passenger getting off the plane say he had paid $700 to fly?  That is highly unlikely.  And airline lawyers and regulators (including many, we are sure, with economics Ph. D.'s) appear to share that common-sensical view.  It is in fact illegal to "increase the price" of "air transportation . . . after [such] air transportation has been purchased by the consumer."  14 CFR §399.88(a) (2015).  But it is a safe bet that no airline has ever gotten into trouble by offering a payment not to fly.[9]

––––––––––

[8] The dissent offers, alternatively, a definition of "price," but that only further proves our point.  "Price," says the dissent, is "[t]he amount of money or other consideration asked for or given in exchange for something else."  *Post,* at 6 (quoting Black's Law Dictionary 1380).  But the "effective" rates posited by EPSA and the dissent do not meet that test.  If $10 is the actual rate for a unit of retail electricity, that is the only amount either "asked for" or "given" in exchange for power.  A retail customer is asked to pay $10 by its LSE, and if it buys that electricity, it gives the LSE that same $10.  By contrast, the $15 "effective" rate is neither asked for nor given by anyone.

[9] The dissent replaces our simple, real-world example with a convoluted, fictitious one—but once again merely confirms our point.  Suppose, the dissent says, that an airline cancels a passenger's $400 ticket;

And EPSA's "effective price increase" claim fares even worse when it comes to payments not to use electricity. In EPSA's universe, a wholesale demand response program raises retail rates by compelling consumers to "pay" the price of forgoing demand response compensation. But such a consumer would be even more surprised than our air traveler to learn of that price hike, because the natural consequence of wholesale demand response programs is to bring *down* retail rates. Once again, wholesale market operators accept demand response bids only if those offers lower the wholesale price. See *supra,* at 7–8. And when wholesale prices go down, retail prices tend to follow, because state regulators can, and mostly do, insist that wholesale buyers eventually pass on their savings to consumers. EPSA's theoretical construct thus runs headlong into the real world of electricity sales—where the Rule does anything but increase retail prices.

EPSA's second argument that FERC intruded into the States' sphere is more historical and purposive in nature. According to EPSA, FERC deliberately "lured [retail customers] into the[ ] wholesale markets"—and, more, FERC did so "only because [it was] dissatisfied with the States' exercise of their undoubted authority" under §824(b) to regulate retail sales. Brief for Respondents 23; see *id.,* at 2–3, 31, 34. In particular, EPSA asserts, FERC disapproved of "many States' continued preference" for stable

————————

gives him a refund plus an extra $300; and then tells him that if he wants to repurchase the ticket, he must pay $700. Aha!, says the dissent—isn't the price now $700? See *post,* at 5–6. Well, yes it is, because that is now the *actual* amount the passenger will have to hand over to the airline to receive a ticket in exchange (or in the dissent's definition of price, the amount "asked for" and "given," see n. 8, *supra*). In other words, in search of an intuitive way to explain its "effective rate" theory, the dissent must rely on an "actual rate" hypothetical. But all that does is highlight the distance, captured in the law, between real prices (reflecting amounts paid) and effective ones (reflecting opportunity costs).

pricing—that is, for insulating retail rates from short-term fluctuations in wholesale costs. *Id.,* at 28. In promoting demand response programs—or, in EPSA's somewhat less neutral language, in "forc[ing] retail customers to respond to wholesale price signals"—FERC acted "for the express purpose of overriding" that state policy. *Id.,* at 29, 49.

That claim initially founders on the true facts of how wholesale demand response came about. Contra EPSA, the Commission did not invent the practice. Rather, and as described earlier, the impetus came from wholesale market operators. See *supra,* at 8. In designing their newly organized markets, those operators recognized almost at once that demand response would lower wholesale electricity prices and improve the grid's reliability. So they quickly sought, and obtained, FERC's approval to institute such programs. Demand response, then, emerged not as a Commission power grab, but instead as a market-generated innovation for more optimally balancing wholesale electricity supply and demand.

And when, years later (after Congress, too, endorsed the practice), FERC began to play a more proactive role, it did so for the identical reason: to enhance the wholesale, not retail, electricity market. Like the market operators, FERC saw that sky-high demand in peak periods threatened network breakdowns, compelled purchases from inefficient generators, and consequently drove up wholesale prices. See, *e.g.,* 73 Fed. Reg. 64103, ¶16; 76 *id.*, at 16660, ¶10; see *supra,* at 6–7. Addressing those problems—which demand response does—falls within the sweet spot of FERC's statutory charge. So FERC took action promoting the practice. No doubt FERC recognized connections, running in both directions, between the States' policies and its own. The Commission understood that by insulating consumers from price fluctuations, States contributed to the wholesale market's difficulties in optimally balancing supply and demand. See 76 Fed. Reg.

16667–16668, ¶¶57, 59; *supra,* at 6–7. And FERC realized that increased use of demand response in that market would (by definition) inhibit retail sales otherwise subject to State control. See 73 Fed. Reg. 64167. But nothing supports EPSA's more feverish idea that the Commission's interest in wholesale demand response emerged from a yen to usurp State authority over, or impose its own regulatory agenda on, retail sales. In promoting demand response, FERC did no more than follow the dictates of its regulatory mission to improve the competitiveness, efficiency, and reliability of the wholesale market.

Indeed, the finishing blow to both of EPSA's arguments comes from FERC's notable solicitude toward the States. As explained earlier, the Rule allows any State regulator to prohibit its consumers from making demand response bids in the wholesale market. See 76 *id.*, at 16676, ¶114; 73 *id.*, at 64119, ¶154; *supra,* at 12. Although claiming the ability to negate such state decisions, the Commission chose not to do so in recognition of the linkage between wholesale and retail markets and the States' role in overseeing retail sales. See 76 Fed. Reg. 16676, ¶¶112–114. The veto power thus granted to the States belies EPSA's view that FERC aimed to "obliterate[ ]" their regulatory authority or "override" their pricing policies. Brief for Respondents 29, 33. And that veto gives States the means to block whatever "effective" increases in retail rates demand response programs might be thought to produce. Wholesale demand response as implemented in the Rule is a program of cooperative federalism, in which the States retain the last word. That feature of the Rule removes any conceivable doubt as to its compliance with §824(b)'s allocation of federal and state authority.

C

One last point, about how EPSA's position would subvert the FPA.

EPSA's jurisdictional claim, as may be clear by now, stretches very far. Its point is not that this single Rule, relating to compensation levels, exceeds FERC's power. Instead, EPSA's arguments—that rewarding energy conservation raises effective retail rates and that "luring" consumers onto wholesale markets aims to disrupt state policies—suggest that the entire practice of wholesale demand response falls outside what FERC can regulate. EPSA proudly embraces that point: FERC, it declares, "has no business regulating 'demand response' at all." *Id.*, at 24. Under EPSA's theory, FERC's earlier Order No. 719, although never challenged, would also be ultra vires because it requires operators to open their markets to demand response bids. And more: FERC could not even approve an operator's voluntary plan to administer a demand response program. See Tr. of Oral Arg. 44. That too would improperly allow a retail customer to participate in a wholesale market.

Yet state commissions could not regulate demand response bids either. EPSA essentially concedes this point. See Brief for Respondents 46 ("That may well be true"). And so it must. The FPA "leaves no room either for direct state regulation of the prices of interstate wholesales" or for regulation that "would indirectly achieve the same result." *Northern Natural Gas Co.* v. *State Corporation Comm'n of Kan.*, 372 U. S. 84, 91 (1963). A State could not oversee offers, made in a wholesale market operator's auction, that help to set wholesale prices. Any effort of that kind would be preempted.

And all of that creates a problem. If neither FERC nor the States can regulate wholesale demand response, then by definition no one can. But under the Act, no electricity transaction can proceed unless it is regulable by someone. As earlier described, Congress passed the FPA precisely to eliminate vacuums of authority over the electricity markets. See *supra,* at 2–3. The Act makes federal and state

powers "complementary" and "comprehensive," so that "there [will] be no 'gaps' for private interests to subvert the public welfare." *Louisiana Power & Light Co.*, 406 U. S., at 631. Or said otherwise, the statute prevents the creation of any regulatory "no man's land." *FPC* v. *Transcontinental Gas Pipe Line Corp.*, 365 U. S. 1, 19 (1961); see *id.,* at 28. Some entity must have jurisdiction to regulate each and every practice that takes place in the electricity markets, demand response no less than any other.[10]

For that reason, the upshot of EPSA's view would be to extinguish the wholesale demand response program in its entirety. Under the FPA, each market operator must submit to FERC all its proposed rules and procedures. See 16 U. S. C. §§824d(c)–(d); 18 CFR §§35.28(c)(4), 35.3(a)(1). Assume that, as EPSA argues, FERC could not authorize any demand response program as part of that package. Nor could FERC simply allow such plans to go into effect without its consideration and approval. There are no "off the books" programs in the wholesale electricity markets—because, once again, there is no regulatory "no man's land." *Transcontinental*, 365 U. S., at 19. The FPA mandates that FERC review, and ensure the reasonable-

——————

[10] The dissent contests this point (complaining that our decades' worth of precedents affirming it partly rely on legislative history), but the example the dissent offers in response misses the mark. See *post,* at 7–8. The dissent hypothesizes a rule enabling generators to sell directly to consumers and fixing all generation, transmission, and retail rates. But of course neither FERC nor the States could issue such a rule: If FERC did so, it would interfere with the States' authority over retail sales and rates as well as (most) generation; if a State did so, it would interfere with FERC's power over transmission. Thus, to implement such a scheme, the States would need to do some things and FERC to do others. And if the one or the other declined to cooperate, then the full scheme could not proceed. But that just goes to show that the FPA divides regulatory power over electricity matters between FERC and the States. The example does nothing to demonstrate that some electricity transactions can proceed outside any regulator's authority.

ness of, every wholesale rule and practice. See 16 U. S. C. §§824d(a), 824e(a); *supra,* at 3, 14–15. If FERC could not carry out that duty for demand response, then those programs could not go forward.

And that outcome would flout the FPA's core objects. The statute aims to protect "against excessive prices" and ensure effective transmission of electric power. *Pennsylvania Water & Power Co.* v. *FPC*, 343 U. S. 414, 418 (1952); see *Gulf States Util. Co.* v. *FPC*, 411 U. S. 747, 758 (1973). As shown above, FERC has amply explained how wholesale demand response helps to achieve those ends, by bringing down costs and preventing service interruptions in peak periods. See *supra,* at 20. No one taking part in the rulemaking process—not even EPSA— seriously challenged that account. Even as he objected to FERC's compensation formula, Commissioner Moeller noted the unanimity of opinion as to demand response's value: "[N]owhere did I review any comment or hear any testimony that questioned the benefit of having demand response resources participate in the organized wholesale energy markets. On this point, there is no debate." 76 Fed. Reg. 16679; see also App. 82, EPSA, Comments on Proposed Rule (avowing "full[ ] support" for demand response participation in wholesale markets because of its "economic and operational" benefits).[11] Congress itself

————————

[11] EPSA now contends that wholesale demand response is unnecessary because state regulators can adopt programs to reduce demand at the retail level. See Brief for Respondents 46–47. For example, States can insist that utilities give rebates to customers for not using energy at certain times. See n. 2, *supra.* But according to both the Commission and market participants, state-level programs cannot offer nearly the same benefits as wholesale demand response because individual utilities lack the regional scope and real-time information needed to identify when demand response will lower prices and ensure reliability system-wide. See 73 Fed. Reg. 64103, ¶18; Energy Primer 45–46; Brief for NRG Energy, Inc., as *Amicus Curiae* 20–22. Similarly, FERC addressed and rejected the dissent's suggestion that wholesale market

agreed, "encourag[ing]" greater use of demand response participation at the wholesale level. EPAct §1252(f), 119 Stat. 966. That undisputed judgment extinguishes any last flicker of life in EPSA's argument. We will not read the FPA, against its clear terms, to halt a practice that so evidently enables the Commission to fulfill its statutory duties of holding down prices and enhancing reliability in the wholesale energy market.

## III

These cases present a second, narrower question: Is FERC's decision to compensate demand response providers at LMP—the same price paid to generators—arbitrary and capricious? Recall here the basic issue. See *supra,* at 9–12. Wholesale market operators pay a single price— LMP—for all successful bids to supply electricity at a given time and place. The Rule orders operators to pay the identical price for a successful bid to conserve electricity so long as that bid can satisfy a "net benefits test"— meaning that it is sure to bring down costs for wholesale purchasers. In mandating that payment, FERC rejected an alternative proposal under which demand response providers would receive LMP minus G (LMP-G), where G is the retail rate for electricity. According to EPSA and others favoring that approach, demand response providers get a windfall—a kind of "double-payment"—unless market operators subtract the savings associated with conserving electricity from the ordinary compensation level. 76 Fed. Reg. 16663, ¶24. EPSA now claims that FERC failed to adequately justify its choice of LMP rather than

---

operators could pay LSEs to reduce their electricity purchases: Because LSEs lose revenues whenever demand goes down, any demand response programs targeting those actors would be highly inefficient. See FERC, Assessment of Demand Response and Advanced Metering 72 (2006); Tr. of Oral Arg. 56 (Solicitor General noting that LSEs engaged in demand response would be "cannibaliz[ing] their own profits").

LMP-G.

In reviewing that decision, we may not substitute our own judgment for that of the Commission. The "scope of review under the 'arbitrary and capricious' standard is narrow." *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983). A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives. Rather, the court must uphold a rule if the agency has "examine[d] the relevant [considerations] and articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Ibid.* (internal quotation marks omitted). And nowhere is that more true than in a technical area like electricity rate design: "[W]e afford great deference to the Commission in its rate decisions." *Morgan Stanley*, 554 U. S., at 532.

Here, the Commission gave a detailed explanation of its choice of LMP. See 76 Fed. Reg. 16661–16669, ¶¶18–67. Relying on an eminent regulatory economist's views, FERC chiefly reasoned that demand response bids should get the same compensation as generators' bids because both provide the same value to a wholesale market. See *id.,* at 16662–16664, 16667–16668, ¶¶20, 31, 57, 61; see also App. 829–851, Reply Affidavit of Dr. Alfred E. Kahn (Aug. 30, 2010) (Kahn Affidavit). FERC noted that a market operator needs to constantly balance supply and demand, and that either kind of bid can perform that service cost-effectively—*i.e.*, in a way that lowers costs for wholesale purchasers. See 76 Fed. Reg. 16667–16668, ¶¶56, 61. A compensation system, FERC concluded, therefore should place the two kinds of bids "on a competitive par." *Id.,* at 16668, ¶61 (quoting Kahn Affidavit); see also App. 830, Kahn Affidavit (stating that "economic efficiency requires" compensating the two equally given their equivalent function in a "competitive power mar-

ket[ ]"). With both supply and demand response available on equal terms, the operator will select whichever bids, of whichever kind, provide the needed electricity at the lowest possible cost. See Rehearing Order, 137 FERC, at 62,301–62,302, ¶68 ("By ensuring that both . . . receive the same compensation for the same service, we expect the Final Rule to enhance the competitiveness" of wholesale markets and "result in just and reasonable rates").

That rationale received added support from FERC's adoption of the net benefits test. The Commission realized during its rulemaking that in some circumstances a demand response bid—despite reducing the wholesale rate— does *not* provide the same value as generation. See 76 Fed. Reg. 16664–16665, ¶38. As described earlier, that happens when the distinctive costs associated with compensating a demand response bid exceed the savings from a lower wholesale rate: The purchaser then winds up paying more than if the operator had accepted the best (even though higher priced) supply bid available. See *supra,* at 10–11. And so FERC developed the net benefits test to filter out such cases. See 76 Fed. Reg. 16666– 16667, ¶¶50–53. With that standard in place, LMP is paid only to demand response bids that benefit wholesale purchasers—in other words, to those that function as "cost-effective alternative[s] to the next highest-bid generation." *Id.,* at 16667, ¶54. Thus, under the Commission's approach, a demand response provider will receive the same compensation as a generator only when it is in fact providing the same service to the wholesale market. See *ibid.,* ¶53.

The Commission responded at length to EPSA's contrary view that paying LMP, even in that situation, will overcompensate demand response providers because they are also "effectively receiv[ing] 'G,' the retail rate that they do not need to pay." *Id.*, at 16668, ¶60. FERC explained that compensation ordinarily reflects only the value of the

service an entity provides—not the costs it incurs, or benefits it obtains, in the process. So when a generator presents a bid, "the Commission does not inquire into the costs or benefits of production." *Ibid.*, ¶62. Different power plants have different cost structures. And, indeed, some plants receive tax credits and similar incentive payments for their activities, while others do not. See Rehearing Order, 137 FERC, at 62,301, ¶65, and n. 122. But the Commission had long since decided that such matters are irrelevant: Paying LMP to all generators—although some then walk away with more profit and some with less—"encourages more efficient supply and demand decisions." 76 Fed. Reg. 16668, ¶62 (internal quotation marks omitted). And the Commission could see no economic reason to treat demand response providers any differently. Like generators, they too experience a range of benefits and costs—both the benefits of not paying for electricity and the costs of not using it at a certain time. But, FERC again concluded, that is immaterial: To increase competition and optimally balance supply and demand, market operators should compensate demand response providers, like generators, based on their contribution to the wholesale system. See *ibid.*; 137 FERC, at 62,300, ¶60.

Moreover, FERC found, paying LMP will help demand response providers overcome certain barriers to participation in the wholesale market. See 76 Fed. Reg. 16667–16668, ¶¶57–59. Commenters had detailed significant start-up expenses associated with demand response, including the cost of installing necessary metering technology and energy management systems. See *id.,* at 16661, ¶18, 16667–16668, ¶57; see also, *e.g.,* App. 356, Viridity Energy, Inc., Comments on Proposed Rule on Demand Response Compensation in Organized Wholesale Energy Markets (May 13, 2010) (noting the "capital investments and operational changes needed" for demand response

participation). The Commission agreed that such factors inhibit potential demand responders from competing with generators in the wholesale markets. See 76 Fed. Reg. 16668, ¶59. It concluded that rewarding demand response at LMP (which is, in any event, the price reflecting its value to the market) will encourage that competition and, in turn, bring down wholesale prices. See *ibid.*

Finally, the Commission noted that determining the "G" in the formula LMP-G is easier proposed than accomplished. See *ibid.,* ¶63. Retail rates vary across and even within States, and change over time as well. Accordingly, FERC concluded, requiring market operators to incorporate G into their prices, "even though perhaps feasible," would "create practical difficulties." *Ibid.* Better, then, not to impose that administrative burden.

All of that together is enough. The Commission, not this or any other court, regulates electricity rates. The disputed question here involves both technical understanding and policy judgment. The Commission addressed that issue seriously and carefully, providing reasons in support of its position and responding to the principal alternative advanced. In upholding that action, we do not discount the cogency of EPSA's arguments in favor of LMP-G. Nor do we say that in opting for LMP instead, FERC made the better call. It is not our job to render that judgment, on which reasonable minds can differ. Our important but limited role is to ensure that the Commission engaged in reasoned decisionmaking—that it weighed competing views, selected a compensation formula with adequate support in the record, and intelligibly explained the reasons for making that choice. FERC satisfied that standard.

## IV

FERC's statutory authority extends to the Rule at issue here addressing wholesale demand response. The Rule

governs a practice directly affecting wholesale electricity rates. And although (inevitably) influencing the retail market too, the Rule does not intrude on the States' power to regulate retail sales. FERC set the terms of transactions occurring in the organized wholesale markets, so as to ensure the reasonableness of wholesale prices and the reliability of the interstate grid—just as the FPA contemplates. And in choosing a compensation formula, the Commission met its duty of reasoned judgment. FERC took full account of the alternative policies proposed, and adequately supported and explained its decision. Accordingly, we reverse the judgment of the Court of Appeals for the District of Columbia Circuit and remand the cases for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE ALITO took no part in the consideration or decision of these cases.

# SUPREME COURT OF THE UNITED STATES

_____

### Nos. 14–840 and 14–841

_____

### FEDERAL ENERGY REGULATORY COMMISSION, PETITIONER
14–840                     *v.*
ELECTRIC POWER SUPPLY ASSOCIATION, ET AL.


### ENERNOC, INC., ET AL., PETITIONERS
14–841                     *v.*
ELECTRIC POWER SUPPLY ASSOCIATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[January 25, 2016]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

I believe the Federal Power Act (FPA or Act), 16 U. S. C. §791a *et seq.*, prohibits the Federal Energy Regulatory Commission (FERC) from regulating the demand response of retail purchasers of power. I respectfully dissent from the Court's holding to the contrary.

## I
### A

I agree with the majority that FERC has the authority to regulate practices "affecting" wholesale rates. §§824d(a), 824e(a); *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore*, 487 U. S. 354, 371 (1988). I also agree that this so-called "affecting" jurisdiction cannot be limitless. And I suppose I could even live with the Court's "direct effect" test as a reasonable limit. *Ante,* at 15. But as the majority recognizes, *ante,* at 17, that extratextual limit on the "affecting" jurisdiction merely supplements,

not supplants, limits that are already contained in the statutory text and structure.  I believe the Court misconstrues the primary statutory limit.  (Like the majority, I think that deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), is unwarranted because the statute is clear.)

The Act grants FERC authority to regulate the "generation . . . [and] transmission of electric energy in interstate commerce and the sale of such energy at wholesale." §824(a).  Yet the majority frames the issue thusly: "[T]o uphold the [r]ule, we also must determine that it does not regulate *retail* electricity sales." *Ante,* at 17.  That formulation inverts the proper inquiry.  The pertinent question under the Act is whether the rule regulates sales "*at wholesale.*"  If so, it falls within FERC's regulatory authority.  If not, the rule is unauthorized whether or not it happens to regulate "*retail* electricity sales"; for, with exceptions not material here, the FPA prohibits FERC from regulating "*any other* sale of electric energy" that is *not* at wholesale.   §824(b)(1) (emphasis added).   (The majority wisely ignores FERC's specious argument that the demand-response rule does not regulate any sale, wholesale or retail.  See Brief for Petitioner in No. 14–840, p. 39.  Paying someone *not* to conclude a transaction that otherwise would without a doubt have been concluded is most assuredly a regulation of that transaction.  Cf. *Gonzales* v. *Raich*, 545 U. S. 1, 39–40 (2005) (SCALIA, J., concurring in judgment).)

Properly framing the inquiry matters not because I think there exists "some undefined category of . . . electricity sales" that is "non-retail [and] non-wholesale," *ante,* at 18, n. 7,* but because a proper framing of the inquiry is

_____

*Although the majority dismisses this possibility, in fact it appears to think that demand response is in that category: It rejects the conclusion that the demand-response rule regulates retail sales, *ante,* at 17–23,

important to establish the default presumption regarding the scope of FERC's authority. While the majority would find every sale of electric energy to be *within* FERC's authority to regulate *unless* the transaction is demonstrably a retail sale, the statute actually *excludes* from FERC's jurisdiction all sales of electric energy *except* those that are demonstrably sales at wholesale.

So what, exactly, is a "sale of electric energy at wholesale"? We need not guess, for the Act provides a definition: "a sale of electric energy to any person *for resale*." §824(d) (emphasis added). No matter how many times the majority incants and italicizes the word "wholesale," *ante,* at 19–20, nothing can change the fact that the vast majority of (and likely all) demand-response participants— "[a]ggregators of multiple users of electricity, as well as large-scale individual users like factories or big-box stores," *ante,* at 7—*do not resell electric energy*; they consume it themselves. FERC's own definition of demand response is aimed at energy *consumers*, not resellers. 18 CFR §35.28(b)(4) (2015).

It is therefore quite beside the point that the challenged "[r]ule addresses—and addresses only—transactions occurring on the wholesale market," *ante,* at 19. For FERC's regulatory authority over electric-energy sales depends not on which "market" the "transactions occu[r] on" (whatever that means), but rather on the *identity of the putative purchaser*. If the purchaser is one who resells electric energy to other customers, the transaction is one "at wholesale" and thus within FERC's authority. If not, then not. Or so, at least, says the statute. As we long ago said of the parallel provision in the Natural Gas Act, 15 U. S. C. §717, "[t]he line of the statute [i]s thus clear and

_____

yet also implicitly rejects the conclusion that it regulates wholesale sales—otherwise why rely on FERC's "affecting" jurisdiction to rescue the rule's legitimacy?

complete. It cut[s] sharply and cleanly between sales for resale and direct sales for consumptive uses. No exceptions [a]re made in either category for particular uses, quantities, or otherwise." *Panhandle Eastern Pipe Line Co.* v. *Public Serv. Comm'n of Ind.*, 332 U. S. 507, 517 (1947). The majority makes no textual response to this plain reading of the statute.

The demand-response bidders here indisputably do not resell energy to other customers. It follows that the rule does not regulate electric-energy sales "at wholesale," and 16 U. S. C. §824(b)(1) therefore forbids FERC to regulate these demand-response transactions. See *New York* v. *FERC*, 535 U. S. 1, 17 (2002). That is so whether or not those transactions "directly affect" wholesale rates; as we recently said in another context, we will not adopt a construction that "needlessly produces a contradiction in the statutory text." *Shapiro* v. *McManus*, 577 U. S. ___, ___ (2015) (slip op., at 4). A faithful application of that principle would compel the conclusion that FERC may not "do under [§§824d(a) and 824e(a)] what [it] is forbidden to do under [§824(b)(1)]." *Id.,* at ___ (slip op., at 5).

B

The analysis could stop there. But the majority is wrong even on its own terms, for the rule at issue here does in fact regulate "*retail* electricity sales," which are indisputably "matters . . . subject to regulation by the States" and therefore off-limits to FERC. §824(a); see *FPC* v. *Conway Corp.*, 426 U. S. 271, 276 (1976); *Panhandle Eastern Pipe Line Co.*, *supra*, at 517–518. The demand-response participants are retail customers—they purchase electric energy solely for their own consumption. And FERC's demand-response scheme is intentionally "designed to induce lower consumption of electric energy"—in other words, to induce a reduction in "*retail* electricity sales"—by offering "incentive payments" to those custom-

ers. 18 CFR §35.28(b)(4). The incentive payments effectively increase the retail price of electric energy for participating customers because they must now account for the opportunity cost of using, as opposed to abstaining from using, more energy. In other words, it literally *costs them more* to buy energy on the retail market. In the court below, FERC conceded that offering *credits* to retail customers to reduce their electricity consumption "would be an impermissible intrusion into the retail market" because it would in effect regulate retail rates. 753 F. 3d 216, 223 (CADC 2014). Demand-response incentive payments are identical in substance.

The majority resists this elementary economic conclusion (notwithstanding its own exhortation to "think back to Econ 101," *ante,* at 5). Why? Because its self-proclaimed "common-sensical" view dictates otherwise. *Ante,* at 22. Maybe the easiest way to see the majority's error is to take its own example: an airline passenger who rejects a $300 voucher for taking a later flight. Consider the following formulation of that example, indistinguishable in substance from the majority's formulation. (Indistinguishable because the hypothetical passenger has exactly the same options and outcomes available to him.) Suppose the airline said to the passenger: "We have proactively canceled your ticket and refunded $400 to your account; and because we have inconvenienced you, we have also deposited an extra $300. The money is yours to use as you like. But if you insist on repurchasing a ticket on the same flight, you must not only pay us $400, but return the $300 too." *Now* what is the effective price of the ticket? Sometimes an allegedly commonsensical intuition is just that—an intuition, often mistaken.

Moving closer to home, recall that demand-response participants must choose either to purchase a unit of energy at the prevailing retail price (say $10) or to withhold from purchasing that unit and receive instead an

incentive payment (of say $5). The two options thus present a choice between having a unit of energy, on the one hand, and having $15 more in the bank, on the other. To repeat: take the energy, be $15 poorer; forgo the energy, be $15 richer. Is that not the very definition of price? See Black's Law Dictionary 1380 (10th ed. 2014) ("[t]he amount of money or other consideration asked for or given in exchange for something else"). In fact, is that not *the majority*'s definition of price? *Ante,* at 21 ("the amount of money a consumer will hand over in exchange for power").

In any event, the majority appears to recognize that the effective price is indeed $15—just as the effective price of the airline ticket in the hypothetical is $700. *Ante,* at 22–23, n. 9. That recognition gives away the game. For FERC is prohibited not just from directly setting or modifying retail *prices*; it is prohibited from regulating retail *sales*, no matter the means. *Panhandle Eastern Pipe Line Co., supra,* at 517. Whether FERC sets the "real" retail price (to use the majority's idiosyncratic terminology, *ante,* at 23, n. 9) or the "effective" retail price is immaterial; either way, the rule—*by design*—induces demand-response participants to forgo retail electric-energy purchases they otherwise would have made. As noted, even FERC conceded that offering credits to retail customers would impermissibly regulate retail sales. The majority blithely overlooks this concession in favor of its own myopic view of retail pricing—all the while evading the inconvenient fact that fiddling with the effective retail price of electric energy, be it through incentive payments or hypothetical credits, *regulates retail sales* of electric energy no less than does direct ratesetting.

## C

The majority cites dicta in several of our opinions expressing the assumption that state jurisdiction and federal jurisdiction under FERC cover the field, so that there is no

regulatory "gap"; one entity or the other "must have jurisdiction to regulate each and every practice that takes place in the electricity markets." *Ante*, at 27. The cases that express such a principle, with respect to the Federal Power Act and its companion the Natural Gas Act, base it (no surprise) on legislative history. See, *e.g., FPC* v. *Louisiana Power & Light Co.*, 406 U. S. 621, 631 (1972); *FPC* v. *Transcontinental Gas Pipe Line Corp.*, 365 U. S. 1, 19 (1961); *Panhandle Eastern Pipe Line Co.*, 332 U. S.*,* at 517–518, and n. 13. One would *expect* the congressional proponents of legislation to assert that it is "comprehensive" and leaves no stone unturned. But even if one is a fan of legislative history, surely one cannot rely upon such generalities in determining what a statute actually *does*. Whether it is "comprehensive" and leaves not even the most minor regulatory "gap" surely depends on what it says and not on what its proponents hoped to achieve. I cannot imagine a more irrational interpretive principle than the following, upon which the majority evidently relies:

> "[W]hen a dispute arises over whether a given transaction is within the scope of federal or state regulatory authority, we are not inclined to approach the problem negatively, thus raising the possibility that a 'no man's land' will be created. That is to say, in a borderline case where congressional authority is not explicit we must ask whether state authority can practicably regulate a given area and, if we find that it cannot, then we are impelled to decide that federal authority governs." *Transcontinental Gas Pipe Line Corp., supra,* at 19–20 (citation omitted).

That extravagant and otherwise-unheard-of method of establishing regulatory jurisdiction was not necessary to the judgments that invoked it, and should disappear in the Court's memory hole.

Suppose FERC decides that eliminating the middleman would benefit the public, and therefore promulgates a rule allowing electric-energy generators to sell directly to retail consumers across state lines and fixing generation, transmission, and retail rates for such sales. I think it obvious this hypothetical scheme would be forbidden to FERC. Yet just as surely the States could not enact it either, for only FERC has authority to regulate "the transmission of electric energy in interstate commerce." 16 U. S. C. §824(b)(1); see also *New York*, 535 U. S*.,* at 19–20. Is this a regulatory "gap"? Has the generator-to-consumer sales scheme fallen into a regulatory "no man's land"? *Must* FERC therefore be allowed to implement this scheme on its own? Applying the majority's *logic* would yield nothing but "yesses." Yet the majority acknowledges that neither FERC nor the States have regulatory jurisdiction over this scheme. *Ante*, at 27, n. 10. Such sales transactions, involving a mix of retail and wholesale players—*as the demand-response scheme does*—can be regulated (if at all) only by joint action. I would not call that a "problem," *ante,* at 26; I would call it an inevitable consequence of the federal-state division created by the FPA.

The majority is evidently distraught that affirming the decision below "would . . . extinguish the wholesale demand response program in its entirety." *Ante,* at 27. Alarmist hyperbole. Excluding FERC jurisdiction would at most eliminate *this particular flavor* of FERC-regulated demand response. Nothing prevents FERC from tweaking its demand-response scheme by requiring incentive payments to be offered to *wholesale* customers, rather than retail ones. Brief for Respondent Electric Power Supply Assn. (EPSA) et al. 47–48; Brief for Respondents Midwest Load-Serving Entities 10–11. And retail-level demand-response programs, run by the States, do and would continue to exist. See Brief for Respondent EPSA et al. 46–47; Brief for Respondents Midwest Load-Serving Entities

6–11. In fact Congress seemed to presuppose that *States*, not FERC, would run such programs: The relevant provisions of the Energy Policy Act of 2005, 119 Stat. 594 *et seq.*, are intended "to encourage *States* to coordinate, on a regional basis, *State* energy policies to provide reliable and affordable demand response services." §1252(e)(1), *id.,* at 965, codified at 16 U. S. C. §2642 note (emphasis added). That statute also imposes several duties on the Secretary of Energy to assist States in implementing demand-response programs. §§1252(e)(2), (e)(3), 119 Stat. 965–966. In context, §1252(f) of the 2005 Act is therefore best read as directing the Secretary to eliminate "unnecessary barriers" to *States*' adopting and implementing demand-response systems—and not, as the majority contends, as "praising *wholesale* demand response" systems to be deployed and regulated by FERC, *ante,* at 9 (emphasis added).

Moreover, the rule itself allows States to forbid their retail customers to participate in the existing demand-response scheme. 18 CFR §35.28(g)(1)(i)(A); see Brief for Petitioner in No. 14–840, at 43. The majority accepts FERC's argument that this is merely a matter of grace, and claims that it puts the "finishing blow" to respondents' argument that 16 U. S. C. §824(b)(1) prohibits the scheme. *Ante,* at 25. Quite the contrary. Remember that the majority believes FERC's authority derives from 16 U. S. C. §§824d(a) and 824e(a), the grants of "affecting" jurisdiction. Yet those provisions impose a *duty* on FERC to ensure that "all rules and regulations affecting or pertaining to [wholesale] rates or charges *shall be just and reasonable*." §824d(a) (emphasis added); see §824e(a) (similar); *Conway Corp.*, 426 U. S., at 277–279. If inducing retail customers to participate in wholesale demand-response transactions is necessary to render wholesale rates "just and reasonable," how can FERC, consistent with its statutory mandate, permit States to thwart such

participation?   See Brief for United States as *Amicus Curiae* 20–21, in *Hughes* v. *Talen Energy Marketing, LLC*, No. 14–614 etc., now pending before the Court (making an argument similar to ours); cf. *New England Power Co.* v. *New Hampshire*, 455 U. S. 331, 339–341 (1982).   Although not legally relevant, the fact that FERC—ordinarily so jealous of its regulatory authority, see Brief for United States as *Amicus Curiae* in No. 14–614 etc.—is willing to let States opt out of its demand-response scheme serves to highlight just how far the rule intrudes into the retail electricity market.

## II

Having found the rule to be within FERC's authority, the Court goes on to hold that FERC's choice of compensating demand-response bidders with the "locational marginal price" is not arbitrary and capricious.   There are strong arguments that it is.   Brief for Robert L. Borlick et al. as *Amici Curiae* 5–34.   Since, however, I believe FERC's rule is ultra vires I have neither need nor desire to analyze whether, if it were not ultra vires, it would be reasonable.

*      *      *

For the foregoing reasons, I respectfully dissent.