RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0130p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MISO TRANSMISSION OWNERS,

*Petitioner*,

MIDCONTINENT INDEPENDENT SYSTEM OPERATOR,
INC.,

*Intervenor*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*,

DUKE ENERGY OHIO, INC. and DUKE ENERGY
KENTUCKY, INC.; FIRSTENERGY SERVICE COMPANY,

*Intervenors*.

No. 16-3791

_____

On Petition for Review of Orders of the Federal Energy Regulatory Commission.
Nos. ER12-715-001; ER12-715-003; ER12-715-004.

Decided and Filed:  June 21, 2017

Before:  KEITH, BATCHELDER, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**   Michael J. Thompson, Wendy N. Reed, Patrick L. Morand, WRIGHT
& TALISMAN, P.C., Washington, D.C., for Petitioners.  Carol J. Banta, FEDERAL ENERGY
REGULATORY COMMISSION, Washington, D.C., for Respondent.   Noel Symons,
MCGUIRE WOODS LLP, Washington, D.C., Matthew Allen Fitzgerald, MCGUIRE WOODS
LLP, Richmond, Virginia, for Duke Intervenors.  Morgan E. Parke, Stacey Burbure, Karen Anita
Sealy, FIRSTENERGY CORPORATION, Akron, Ohio, John Lee Shepherd, Jr., Timothy T.
Mastrogiacomo, James P. Daly, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP,
Washington, D.C., for Intervenor FirstEnergy.

———————————

**OPINION**

———————————

SUTTON, Circuit Judge.   Midcontinent Independent System Operator, Inc., is a non-profit association of utilities that manages electrical transmission facilities on behalf of its members.  Under its well-earned acronym, MISO approves infrastructure projects and allocates the costs among its member utilities in order to maintain the electrical grid and increase its capacity.   Duke Energy and American Transmission Systems own utilities in Ohio and Kentucky, and they withdrew from MISO in 2011.  At stake is whether the utilities must pay for projects that MISO approved after they announced their departure but before they left.  The Federal Energy Regulatory Commission ruled in favor of the utilities.  Because the Commission correctly interpreted the terms of MISO's Tariff, we deny the petition for review of its order.

I.

MISO is a regional "association[] of utilities that own electrical transmission lines interconnected to form a regional grid and that agree to delegate operational control of the grid to the association."  *Ill. Commerce Comm'n v. FERC*, 721 F.3d 764, 769 (7th Cir. 2013).  It oversees the electrical grid in all or part of fifteen states in the Midwest and South, including Michigan and Kentucky, as well as the Canadian province of Manitoba.  *Id.* at 769–70. Beginning in 2006, the Federal Energy Regulatory Commission approved changes to MISO's Tariff that enabled it to authorize network expansion projects and divide the costs among the member utilities.  *See Pub. Serv. Comm'n of Wis. v. FERC*, 545 F.3d 1058, 1059 (D.C. Cir. 2008).  The Tariff initially had just two project categories:  Baseline Reliability Projects and Market Efficiency Projects.

In July 2009, American Transmission Systems gave notice that it planned to withdraw from MISO and integrate its Ohio facilities with PJM Interconnection, a neighboring transmission organization.  Duke Energy's Ohio and Kentucky utilities followed suit in May 2010.  Under the Tariff, a utility cannot withdraw from MISO any earlier than the last day of the year following the year it gives notice.  Art. Five, § 1, App'x 635.

Two months after Duke announced its intention to withdraw, MISO proposed a new category of more expensive expansion projects—Multi-Value Projects—most of which would carry wind power to urban markets. *Ill. Commerce Comm'n*, 721 F.3d at 771. The Commission approved this revision to the Tariff. *Midwest Indep. Transmission Sys. Operator, Inc.*, 133 FERC ¶ 61,221 (2010). In August 2010, MISO authorized the first Multi-Value Project.

American Transmission withdrew from MISO in May 2011 before it approved any more Multi-Value Projects. But in early December 2011, just weeks before Duke's scheduled departure, MISO approved a portfolio of sixteen projects, estimated to cost billions of dollars in total. MISO proposed adding a provision to the Tariff, given the harmless-sounding label of Schedule 39, which provided that ex-members could be charged for the costs of Multi-Value Projects approved before their departure.

The Commission approved Schedule 39, but only prospectively. *Midwest Indep. Transmission Sys. Operator, Inc.*, 138 FERC ¶ 61,140 (2012). The Commission determined that MISO could apply Schedule 39 to Duke and American Transmission only to the extent it was consistent with their preexisting obligations under the Tariff. *Id.* at P 74. In a separate proceeding, the Commission ruled that Schedule 39 imposed new obligations on withdrawing members. *Midwest Indep. Transmission Sys. Operator, Inc.*, 153 FERC ¶ 61,101 P 40 (2015). That meant the filed-rate doctrine and the rule against retroactive ratemaking prevented MISO from applying Schedule 39 to Duke and American Transmission and charging them for the Multi-Value Projects. A group of *other* MISO Transmission Owners appealed, claiming that the Commission incorrectly interpreted the Tariff and departed from the reasoning of its prior orders. Duke and American Transmission intervened to support the Commission's order.

II.

*Venue*. In earlier litigation over the MISO Tariff, the parties filed their appeals in the Seventh Circuit, in which MISO has its headquarters, or the D.C. Circuit. That's in keeping with the Federal Power Act's judicial review provision, which provides for venue in "any circuit wherein the licensee or public utility to which the [Commission's] order relates is located or has its principal place of business, or in the [D.C. Circuit]." 16 U.S.C. § 825*l*(b).

But is venue appropriate in our circuit? An initial answer is that no one has challenged venue here. The Commission, it is true, hinted in that direction, asking the utilities "to explain why the instant dispute . . . is properly before this Court." Respondent Br. 5. But the Commission did not move to dismiss or transfer the appeal. The Supreme Court has held that an identical provision in the Natural Gas Act, also administered by FERC, "invest[s] all intermediate federal courts with the power to review orders of the Commission, provided [that] the parties may object that the particular circuit lacks the specified qualifications." *Panhandle E. Pipe Line Co. v. Fed. Power Comm'n*, 324 U.S. 635, 638–39 (1945). Absent such an objection, the Transmission Owners have no obligation to prove that the Sixth Circuit is an appropriate venue for their appeal.

We may transfer the appeal on our own initiative, it is true. *See Brentwood at Hobart v. NLRB*, 675 F.3d 999, 1005 (6th Cir. 2012). But we see no good reason to do so here. Venue lies in the Sixth Circuit because all of MISO's members are "public utilit[ies] to which the order relates," and at least one of them has its principal place of business in this circuit. Even though the Commission's order concerned MISO's Tariff, the petitioners are MISO's members, not MISO itself. That's important because "[v]enue relates to the convenience of litigants." *Panhandle*, 324 U.S. at 639. The case also has legitimate ties to the circuit, as the spark that lit the controversy was the withdrawal from MISO of Ohio and Kentucky utilities. Judicial efficiency weighs against transferring the case as well. The appeal has been pending since June 2016, and has been fully briefed. The MISO Transmission Owners, Duke, and American Transmission all support proceeding with the case here.

It's possible, we suppose, that the Transmission Owners filed this appeal in the Sixth Circuit to take advantage of our less deferential review of the Commission's tariff interpretations. But we need not worry about rewarding circuit shopping because that issue does not affect the outcome of this case, as we next suggest and eventually show.

*Standard of Review*. We generally review the Commission's orders under the arbitrary-and-capricious standard, but we give fresh review to questions of law, such as the interpretation of tariffs and other contracts. *See FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016); *Cincinnati Gas & Elec. Co. v. FERC*, 724 F.2d 550, 554 (6th Cir. 1984). Unlike the D.C. and Seventh Circuits, we do not automatically give deference to the Commission's interpretations of tariffs. *Compare Cincinnati Gas & Elec.*, 724 F.2d at 554, *with Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814–15 (D.C. Cir. 1998); *City of Kaukauna v. FERC*, 214 F.3d 888, 895 (7th Cir. 2000). We instead defer only when the Commission bases its interpretation on its "factual findings or technical expertise." *Cincinnati Gas & Elec. Co.*, 724 F.2d at 554.

The Commission and the MISO Transmission Owners offer competing accounts of whether the Commission based its interpretation of the Tariff on its technical expertise in ratemaking. But we need not take sides. Either way, we would affirm the Commission's interpretation, whether under fresh review or deferential review.

*Pre-Schedule 39 Tariff*. The filed-rate doctrine prohibits MISO from charging Duke and American Transmission higher rates than those included in its filed Tariff, and the rule against retroactive ratemaking prohibits the Commission from ordering utilities to pay such a rate. *See Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 573, 578–79 (1981). That means MISO can bill Duke and American Transmission for a share of the Multi-Value Projects only if the pre-Schedule 39 Tariff authorized those charges.

When the two utilities announced their withdrawal from MISO, the Tariff stated that "a Party that withdraws from [MISO] shall remain responsible for all financial obligations incurred pursuant to [the Tariff] while a Member." Attachment FF, § III.A.2.j, App'x 840. The pre-

Schedule 39 Tariff thus authorizes this charge only if the utilities "incurred" a financial obligation to contribute to the Multi-Value Projects before they withdrew. They did not.

In setting out the framework for network expansion projects, the Tariff says that transmission owners "will bear cost responsibility for [expansion projects] as and to the extent provided by any applicable provision of the Tariff, including . . . any applicable cost allocation method ordered by the Commission." *Id.*, Introduction to Section III, App'x 826. It then explains how to allocate costs for each type of project. Plans for Market Efficiency and Baseline Reliability Projects allocate cost responsibility up front, when MISO approves the project. For both types of projects, the Tariff allocates twenty percent of the total "Project Cost" "on a system-wide basis to all Transmission Customers and recovered through a system-wide rate." *Id.*, § III.A.2.c.ii, App'x 829; § III.A.2.f.i, App'x 837. It allocates the remaining eighty percent of the costs to designated pricing zones and sub-regions, with utilities in those zones paying annual charges calculated under a formula set forth in the Tariff.

Cost responsibility for Multi-Value Projects works differently. Section III.A.2.g.i provides that:

> Costs of Multi Value Projects will be allocated as follows:
>
> i) One hundred percent (100%) of the annual revenue requirements of the Multi Value Projects shall be allocated on a system-wide basis to Transmission Customers that withdraw energy, including External Transactions sinking outside the Transmission Provider's region, and recovered through an MVP Usage Charge pursuant to Attachment MM.

App'x 839.

Two distinctions jump out between cost allocation for the first two categories and cost allocation for Multi-Value Projects. First, the provisions governing Market Efficiency and Baseline Reliability Projects allocate the total "Project Cost" all at once, while the Multi-Value Projects provision allocates "annual revenue requirements" instead. If costs were allocated in full at the time of project approval, the word "annual" would serve no purpose. Second, for Market Efficiency and Baseline Reliability Projects, twenty percent of costs are allocated "on a system-wide basis to all Transmission Customers." But for Multi-Value Projects, the costs are

allocated only to "Transmission Customers *that withdraw energy.*" Accordingly, the "[Multi-Value Project] Usage Charge" is updated monthly based on transmission owners' energy withdrawals from MISO. *See* Attachment MM, § 3, App'x 930–33. The only way to give these deliberate distinctions any effect is to reallocate a project's costs each year based on energy usage. Both distinctions support the conclusion that the relevant Tariff provision reallocates costs for Multi-Value Projects based on the utilities' actual usage of the MISO system, not up front.

Another section of the Tariff points in the same direction. It says that transmission owners who join MISO have no liability for Market Efficiency and Baseline Reliability Projects that the association approved before their arrival. Attachment FF, Section III.A.2.k, App'x 840. That makes sense because MISO allocates the costs for those projects up front. But for Multi-Value Projects, the Tariff says that new members must pay for project costs based on actual usage, which would not be possible with up-front cost allocation. *Id.*

In view of this language and our interpretation of it, Duke and American Transmission did not incur any financial obligations in the short time between approval of the Multi-Value Projects and their withdrawal from MISO for two basic reasons. One: All parties agree that, when Duke and American Transmission left MISO, there were no revenue obligations to allocate because construction had not started yet. Two: Duke and American Transmission ceased to "withdraw energy" from MISO when they joined a new association and thus could not be responsible for future costs.

The Transmission Owners' contrary arguments do not work. In particular, they cannot square their alternative understanding of cost allocation for Multi-Value Projects with the text of the Tariff. The Owners claim that the Commission's interpretation ignores the distinction between cost allocation (assigning liability for a share of a project's eventual cost to each transmission owner) and cost recovery (determining the charges each owner has to pay each year). According to the Owners, the first part of § III.A.2.g.i allocates costs to all "Transmission Customers that withdraw energy"—a group that included Duke and American Transmission at the time MISO approved the slate of Multi-Value Projects—and we should assume (absent a provision saying otherwise) that *all* costs are allocated at the time of approval, just like Market

Efficiency and Baseline Reliability Projects. Charges may change annually based on energy withdrawals, they add, but that doesn't alter the fact that each transmission owner present when MISO approved a project remains responsible for part of the bill.

But this interpretation does not account for the language of the Multi-Value Projects' cost-allocation provisions. Why refer to "annual revenue requirements" rather than "Project Cost" if the Tariff meant to allocate costs up front, as it did for the Market Efficiency and Baseline Reliability Projects? Why restrict allocation to customers "that withdraw energy"? And why not provide an allocation rate that isn't updated based on energy usage? This argument raises many questions. And the answers to all of them cut against it.

The Owners' interpretation has an uncomfortable relationship with the text of the Tariff in other ways. It is hard to say that a provision beginning "[c]osts of Multi Value Projects *will be allocated as follows*" is about anything other than allocation. True, the provision goes on to refer to "recover[y] through an [Multi-Value Project] Usage Charge," as does Attachment MM, but that shouldn't surprise us. The Tariff reallocates each year's revenue requirements in proportion to each transmission owner's annual usage, which means that allocation and recovery amount to the same thing for Multi-Value Projects. It makes no difference that a separate part of the Tariff, Appendix K, distinguishes between the right to challenge a rate and the right to challenge allocation of costs. Those two things may often be distinct. But they need not always be. The Transmission Owners try to introduce a rigid distinction between two concepts that § III.A.2.g.i puts together.

Contrary to the Owners' assertions, there's no background presumption that costs should be allocated up front. The Tariff says that, for Market Efficiency Projects, "cost allocations as a percentage of project cost shall be determined one time at the time that the project is presented to [MISO] for approval." Attachment FF, § II.B.1.c, App'x 818–19. And the allocation to each pricing zone for Baseline Reliability Projects happens one time, on the basis of a formula that can be calculated in advance. *Id.*, § III.A.c.ii, App'x 830. By contrast, it's not even clear how shares of responsibility for the costs of Multi-Value Projects *could* be allocated up front, given that the only rate referred to in § III.A.2.g.i is the continually updated Usage Rate.

The Transmission Owners do not even attempt to answer some of the points made above. They instead object that the Commission did not make some of these arguments in its order, and that we therefore may not consider them on appeal. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943). But *Chenery* tells us not to sustain an administrative order on a different ground from the one the agency offered; it does not forbid us from noting additional reasons that support the agency's position. *See Penn-Cent. Merger and N & W Inclusion Cases*, 389 U.S. 489, 526 n.14 (1968). Here, at any rate, we agree with the basis for the Commission's decision: the Tariff provides that the costs of Multi-Value Projects are reallocated year-to-year, not at the time MISO approves them.

In a related argument, the Transmission Owners suggest that we should remand the order to the Commission because it did not lay out enough reasons to support its interpretation of the Tariff and thus did not engage in "reasoned decision-making." But the Commission's explanation was "clear enough that its path may reasonably be discerned," and thus was not arbitrary and capricious. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quotation omitted).

*Prior Orders.* The Transmission Owners also object that the Commission departed without explanation from the reasoning of two prior orders concerning the MISO Tariff. But those orders said nothing about the timing of cost allocation for Multi-Value Projects. The Transmission Owners lift phrases out of context and incite conflict where none exists. That the order approving the Multi-Value Projects provisions rightly referred to Attachment MM's formula for the Usage Rate as "rate design" respects the Commission's later conclusion that the Usage Rate doubles as an allocation rate. And the Multi-Value Projects provisions did not even exist when the Commission approved the procedures for Market Efficiency and Baseline Reliability Projects, so nothing in that order could conflict with the Commission's decision in this case.

For these reasons, we deny the petition for review.