RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0036p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

LOUISVILLE GAS & ELECTRIC COMPANY; KENTUCKY
UTILITIES COMPANY,

           *Petitioners*,

   *v.*

FEDERAL ENERGY REGULATORY COMMISSION,

           *Respondent*,

CITY UTILITY COMMISSION OF THE CITY OF
OWENSBORO, KENTUCKY,

           *Intervenor*.

> No. 19-4225

─────────────────

On Petition for Review from the Federal Energy Regulatory Commission.
Nos. EL18-203-000; EL18-203-001.

Argued: October 7, 2020

Decided and Filed: February 17, 2021

Before: BOGGS, STRANCH, and THAPAR, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Matthew C. Blickensderfer, FROST BOWN TODD LLC, Cincinnati, Ohio, for
Petitioners. Carol J. Banta, FEDERAL ENERGY REGULATORY COMMISSION,
Washington, D.C., for Respondent. David E. Pomper, SPIEGEL & MCDIARMID LLP,
Washington, D.C., for Intervenor. **ON BRIEF:** Matthew C. Blickensderfer, FROST BOWN
TODD LLC, Cincinnati, Ohio, Jason P. Renzelmann, FROST BROWN TODD LLC, Louisville,
Kentucky, for Petitioners. Carol J. Banta, FEDERAL ENERGY REGULATORY
COMMISSION, Washington, D.C., for Respondent. David E. Pomper, Thomas C. Trauger,
SPIEGEL & MCDIARMID LLP, Washington, D.C., Patrick D. Pace, KAMUF, PACE &
KAMUF, Owensboro, Kentucky, for Intervenor.

———————————

**OPINION**

———————————

THAPAR, Circuit Judge.  When you skip over the basics, things get complicated.  At its core, this is a straightforward case of contract interpretation.  But rather than address the operative text, the Federal Energy Regulatory Commission began with other portions of the contract and treated the matter as an invitation to make complex policy choices.  The Commission's resulting order cannot withstand arbitrary-and-capricious review, so we grant the petition for review, vacate the order, and remand for another go.

I.

This dispute takes place against the backdrop of the interstate wholesale electricity market—not exactly everybody's cup of tea.  So we begin with some (simplified) background.

A.

Start with the market itself.

Imagine you order hand sanitizer online.  The company transfers the item from storage to a large truck.  The truck gets on the road, merges onto the interstate, and covers an enormous distance.  It passes through different states, some of which charge tolls.  It maneuvers through different routes and turnpikes.  Finally, the truck leaves the highway for a local road and drops off the item at your house.

The journey of electricity from a power plant to a home or business is not so different.  A power plant creates the electricity.  The electricity then travels long distances across "transmission lines."  Fed. Energy Regulatory Comm'n ("FERC"), Staff Report, *Energy Primer: A Handbook for Energy Market Basics* 47, 54 (Apr. 2020) ("*Energy Primer*"); FERC, Staff Report, *Reliability Primer* 16 (Dec. 2016) ("*Reliability Primer*").  Interconnected transmission lines make up the grid (much like the interstate).  *Reliability Primer* 16.  And just as states control the roads within their borders, different utilities own and operate the transmission lines in their respective territories.  That means that electricity must sometimes cross from one utility's

lines to another's, and the wholesale customer incurs charges from each utility along the way. *See Ill. Commerce Comm'n v. FERC*, 721 F.3d 764, 778 (7th Cir. 2013); *Wabash Valley Power Ass'n v. FERC*, 268 F.3d 1105, 1116 (D.C. Cir. 2001). Eventually the electricity reaches the target geographic area and then travels across local "distribution lines" to the destination. *Energy Primer* 47; *Reliability Primer* 10.

Just as there may be separate charges for your hand sanitizer and its delivery, so too there are separate costs for the electricity and its transmission from the generator (power plant) to the destination. A wholesale purchaser of electricity can choose between paying for transmission as needed or securing a long-term reservation of transmission rights (like a membership). The former is cheaper (but may not always be available); the latter guarantees that the transmission lines will have capacity when the purchaser needs them. *See* Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils., Order No. 888, 61 Fed. Reg. 21,540, 21,573–74 (1996) ("Order No. 888").

B.

Now consider one fear the government has about this market.

The Federal Energy Regulatory Commission regulates the wholesale electricity market. *See New York v. FERC*, 535 U.S. 1, 26 (2002). Part of the agency's job is to improve reliability and to ensure that utilities' rates and practices are "just and reasonable." *Id.*; *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 777 (2016). If the rates and practices are not just and reasonable, then the Commission must determine the proper remedy. 16 U.S.C. §§ 824d(a), 824e(a); *Elec. Power Supply Ass'n*, 136 S. Ct. at 774. One means of ensuring fair pricing is to promote "a free market in wholesale electricity." *Elec. Power Supply Ass'n*, 136 S. Ct. at 774 (citation omitted). The Commission's goal is to enhance competition.

One of the Commission's concerns is the "pancaked rate." *See* Reg'l Transmission Orgs., Order No. 2000, 65 Fed. Reg. 810, 915 (2000). To understand the pancaked rate, imagine that your delivery driver crosses through five states between loading the truck and delivering the hand sanitizer to your door. Now imagine that each state imposes a toll that you must ultimately pay (either as a surcharge to a one-time delivery fee or through a more expensive membership).

The more states along the journey, the higher the charge, if each state charges a fixed fee for using its roads. Same for electricity: Each utility charges a fixed separate transmission fee, so the more utilities along the way, the higher the charge. That is the pancaked rate (i.e., multiple fixed transmission fees stacked on top of one another). In the Commission's view, pancaked rates stifle market competition and harm consumers. *Id.* at 817.

But there are ways around the pancaked rate. What if your state joined several of its neighbors to form a regional alliance? Collectively, they could agree that residents in each state get reciprocal access to roads throughout the region for one flat fee. Entities called independent system operators provide a similar solution for wholesale electricity customers. *See Louisville Gas & Elec. Co.*, 82 F.E.R.C. ¶ 61,308, p. 62,222 (1998) ("Merger Order"); *Energy Primer* 39. They take over operational control of interconnected transmission lines owned by different utilities. *See* Order No. 888 at 21,595–96; *Energy Primer* 39. The area controlled by the independent system operator is the operator's service territory. And the utilities that own the transmission lines within the area are the operator's members. Independent system operators then charge all wholesale customers a uniform rate for access to all the transmission lines in the service territory. Order No. 888 at 21,596. The Commission regulates their activity (just as it regulates the activities of utilities) and encourages the formation of these operators. *Id.* at 21,595–96.

## C.

The petitioners here—Louisville Gas and Electric Company, and Kentucky Utilities Company—own and operate electric generation, transmission, and distribution facilities in Kentucky and Virginia. Together, they serve nearly one million customers and own thousands of miles of electric transmission and distribution lines.

About two decades ago, Louisville Gas and Kentucky Utilities joined the Midcontinent Independent System Operator ("MISO"). *See Louisville Gas & Elec. Co., et al.*, 114 F.E.R.C. ¶ 61,282, p. 61,925 (2006) ("Withdrawal Order"). MISO operates across fifteen states (including Kentucky) and one Canadian province. *MISO Transmission Owners v. FERC*, 860 F.3d 837, 839 (6th Cir. 2017); *Energy Primer* 91. Customers pay a single rate for access to transmission

lines throughout the MISO service territory (even if those lines are owned by multiple utilities), although the precise rate each customer pays is determined by where in MISO it's located. *Midwest Indep. Transmission Sys. Operator, Inc.*, 109 F.E.R.C. ¶ 61,168, pp. 61,810 & n.14, 61,826 (2004).

Around the same time as they joined MISO, the two companies (hereinafter "Louisville Gas") filed a merger application with the Commission. Based in part on the companies' participation in MISO, the Commission concluded that the merger would not stifle competition. Merger Order at 62,214; *see also* Inquiry Concerning the Comm'n's Merger Pol'y Under the Fed. Power Act, Order No. 592, 61 Fed. Reg. 68,595 (1996). It approved the application.

Then, some years ago, Louisville Gas asked the Commission for permission to withdraw from the network. The Commission approved the withdrawal, provided that the conditions of the merger remained satisfied. In other words, that Louisville Gas implement certain measures to provide its wholesale customers protections like those they enjoyed when Louisville Gas was part of MISO. Withdrawal Order at 61,924, 61,940.

To be specific, protection from pancaked rates. When Louisville Gas was a member of MISO, a transmission of energy from a within-MISO generator to a wholesale customer's facilities occurred entirely within the service territory on MISO lines, so there was only one charge. But once Louisville Gas withdrew, its wholesale customers could face *two* charges for that same transmission: one from MISO for the first leg of the trip (from the power plant to the MISO/Louisville Gas border), then another from Louisville Gas for the second leg (from the border to the final destination). This double-charging is the pancaked rate the Commission was worried about. *Id.* at 61,941. So the Commission required Louisville Gas to implement measures to absorb any additional cost caused by the two transmission legs (to "de-pancake" the rate). *Id.* at 61,940–41. Louisville Gas did so by contracting with its various wholesale customers. And the Commission ultimately approved this arrangement. *See* Rev. Rate Schedule FERC No. 402 ("Schedule"), App. 34–43.

D.

One of those wholesale customers (and the intervenor here) was the City Utility Commission of the City of Owensboro, Kentucky ("Owensboro"). Owensboro is a municipally owned utility within the Louisville Gas service territory that provides electricity to retail customers in south-central Kentucky. A few years ago, Owensboro realized that its coal-fired power plant would need to be closed within the next decade. Owensboro wanted to secure backup service in case the plant suffered intermittent outages before the closure date.

To that end, Owensboro bought a five-year reservation of transmission rights from MISO, beginning on February 1, 2018. If at any time Owensboro wanted electricity from a source within MISO's territory, MISO's transmission lines would be available to complete the first leg of the trip. Ultimately, though, Owensboro (at least on the record before us) used the MISO lines only three days during the first year of the contract. It purchased electricity for a two-day period from within-MISO generators in July, 2018. Then Owensboro entered a long-term reservation of electricity from Big Rivers Electric Company (another within-MISO generator), but Owensboro only once needed that electricity delivered to its facilities, on September 26, 2018.

Owensboro asked Louisville Gas to absorb the costs Owensboro paid to MISO for the transmission rights, relying on the de-pancaking contract. Owensboro pointed to Louisville Gas's promise to "shield" wholesale customers "from any pancaking of transmission . . . charges" for certain transactions "in which" they "purchase[d] electricity from a source in the" MISO service territory "for delivery" in Louisville Gas's service territory. Schedule at 2, App. 35. When Louisville Gas refused to credit the charges, Owensboro brought a complaint before the Commission, seeking enforcement of the contract. 16 U.S.C. § 825e; 18 C.F.R. § 385.206(a).

The Commission agreed with Owensboro that the contract required Louisville Gas to absorb all the costs that Owensboro had incurred from MISO since February, 2018. The agency thus directed Louisville Gas to credit Owensboro for those transmission costs and denied Louisville Gas's subsequent request for rehearing. *Owensboro Mun. Utils. v. Louisville Gas &*

*Elec. Co. and Ky. Utils. Co.*, 166 F.E.R.C. ¶ 61,131, p. 61,563 (2019) ("Order"), *reh'g denied*, 169 F.E.R.C. ¶ 61,030, 2019 WL 5288283 (Oct. 17, 2019) ("Reh'g Order"). Louisville Gas now petitions this court for review. 16 U.S.C. § 825*l*(b).

II.

In reviewing an agency decision, we consider questions of law, such as the interpretation of filed tariffs, de novo. *See MISO Transmission Owners*, 860 F.3d at 841; *Cincinnati Gas & Elec. Co. v. FERC*, 724 F.2d 550, 554 (6th Cir. 1984). And we defer to the Commission "only when the Commission bases its interpretation on its 'factual findings or technical expertise.'" *MISO Transmission Owners*, 860 F.3d at 841 (quoting *Cincinnati Gas & Elec. Co.*, 724 F.2d at 554).

But in all cases agencies must engage in "reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). They must "examine the relevant data and articulate a satisfactory explanation for [their] action including a rational connection between the facts found and the choice made." *Id.* at 43 (cleaned up). When they fail to do so, the resulting action is considered "arbitrary and capricious." *Id.* at 56. And from there, the proper disposition is clear: We "shall" hold the action "unlawful" and "set [it] aside." 5 U.S.C. § 706(2)(A). That is precisely what we do here.

A.

Here are the basics of the legal issue that was presented to the Commission. From the first page of Owensboro's complaint before the agency, this has explicitly been an action for "enforcement (rather than change)" of an existing contract. Compl., App. 1 n.1. To enforce the contract, of course, the Commission must interpret the contract.

Kentucky contract law governs interpretation of the contract. Schedule at 9, App. 42 (choice-of-law clause); *see S. Cal. Edison Co. v. FERC*, 502 F.3d 176, 181 (D.C. Cir. 2007).[1]

---

[1]No party has mentioned choice of law, but the issue is "necessarily raise[d]" in a challenge to the Commission's contract interpretation. *Pennzoil Co. v. FERC*, 645 F.2d 360, 384 n.46 (5th Cir. 1981). And even before an agency, contract law *is* state law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Pennzoil*, 645 F.2d at 383–87.

That means the reader starts with the text's "ordinary meaning." *Smith v. Crimson Ridge Dev., LLC*, 410 S.W.3d 619, 621 (Ky. Ct. App. 2013). That text is, at first, a bit daunting:

> With respect to any MMD Transaction in which [Owensboro] purchases electricity from a source in [MISO] for delivery to [Owensboro]'s load . . . : (i) [Louisville Gas] shall credit [its transmission billings] to [Owensboro] by an amount equal to the [MISO charges] which [Owensboro] incurs to deliver such purchased electricity to the [MISO]/[Louisville Gas border] . . . .

Schedule at 2, App. 35. But the text becomes less daunting if we return to the basics. The provision answers four essential questions: Who? What? When? And how much?

- *Who?* Owensboro is seeking something from Louisville Gas.
- *What?* Owensboro wants a credit against the amount it owes Louisville Gas for reserving transmission rights within Louisville Gas's service territory.
- *When?* Whenever Owensboro enters certain "MMD Transaction[s]," which here means "transaction[s]" "in which [Owensboro] [1] purchases electricity from a source in the [MISO service territory]" [2] to be delivered to Owensboro's facilities. Schedule at 1–2, App. 34–35.
- *How Much?* The amount Owensboro "incurs" from MISO "to deliver such purchased electricity" from the generator to the MISO/Louisville Gas border.

This case is about the "when" and the "how much." Did Owensboro enter into an eligible transaction? And if so, how much did Owensboro incur to deliver the bought electricity?

With this much in mind, we turn to the Commission's analysis.

### B.

The Commission did not take long to deviate from a focus on the text's ordinary meaning. That text, the Commission said, did not support Louisville Gas's view of the case. Order at 61,562–63. The Commission did not provide any further analysis of the operative provision.

So what did it analyze? The Commission started with a separate provision (a full page later in the contract) stating that the de-pancaking obligation was "intended to implement" prior orders from the Commission. It then looked at an "introductory sentence" stating that Louisville Gas would shield wholesale customers "from any pancaking of transmission and ancillary

services charges" for MMD Transactions.  *Id.*  The agency would later clarify, in denying rehearing, that it had found the operative provision "ambiguous."  Reh'g Order at \*4.  But that order, too, lacked any analysis of the operative text.

From there, the Commission viewed (and continues to view) this case as one about regulatory policy.  *See* Order at 61,562–63; Resp. Br. 24–25, 28–41.  The Commission emphasized that the contract was "intended to implement various orders" from the agency's earlier proceedings.  Order at 61,562–63; Reh'g Order at \*3–5.  The focus then turned to "the Commission's expectations as discussed" in those prior orders, and the Commission explained that those expectations would "guide[]" its "holding."  Order at 61,563.

The Commission next tried to address the "when" question but gave no discernible answer.  Owensboro, the agency found, had "demonstrated [its] current[] need[]" for the MISO transmission reservation,  and so the reservation qualified for reimbursement.  *Id.* at 61,563–64.  The Commission also suggested (inexplicably) that Owensboro need not purchase any electricity for a transaction to be one "in which [Owensboro] purchases electricity."  Schedule at 2, App. 35; *compare* Order at 61,564 (declining to require any "minimum" usage but stating that Owensboro "used th[e] reservation"), *with* Reh'g Order at \*5 ("[A] showing of transmission reservations was sufficient to trigger the reimbursement obligation.").[2]  As for the "how much" question, the Commission just skipped the matter altogether.  The result, though, was clear: Louisville Gas had to provide credit for *all* MISO reservation charges to Owensboro beginning on February 1, 2018, apparently for the life of the contract with MISO.

## C.

There are at least three major problems with the Commission's analysis.  First, the failure to explain its finding of ambiguity.  It is a well-accepted tenet of contract law that "a contract is not ambiguous unless, after applying established rules of interpretation, [the language] remains reasonably susceptible to at least two reasonable but conflicting meanings."  *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 765 (2018) (per curiam) (cleaned up); *accord Ky. Shakespeare Festival,*

---

[2]To the extent that the Commission articulated inconsistent views in the Order and Rehearing Order, it had an obligation to explain the change.  *FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 515 (2009).

*Inc. v. Dunaway*, 490 S.W.3d 691, 694–95 (Ky. 2016). Even when the Commission finally discussed ambiguity in the denial of rehearing, it never articulated what the operative text might mean, let alone that the language supported multiple reasonable interpretations, or what those interpretations were.

The second problem is that the Commission relied upon its own unwritten expectations—specifically, that Louisville Gas would provide credit for transactions that its customers "needed." *See* Order at 51,564. But the whole point of contract interpretation is to determine the intention of the *parties* (not the government). *E.g.*, 11 Richard A. Lord, *Williston on Contracts* § 30:2 (4th ed. 2020 update). Even if the Commission's unwritten expectations constitute evidence of the "conditions under which the contract was written" (one relevant parol-evidence consideration), that should be used to *solve* ambiguities about the parties' intent, not to *create* them, as happened here. *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003) (citation omitted) (discussing the permissible use of extrinsic evidence in contract interpretation); *see* Reh'g Order at *4 (contending that the language does not have "an unambiguous plain meaning" in part because of the prior orders).

True, the contract makes explicit reference to prior Commission orders and makes clear that the parties intended to comply with them. *See* Schedule at 1, 3, App. 34, 36. But the prior orders are not the same as the Commission's intentions that accompanied those orders. And nothing in the text of the contract nor the Commission's prior orders suggests that the agency intended Louisville Gas to provide credit for any transaction its customers would "need" to enter.

The third problem is that the Commission's free-form approach, untethered from basic contract law, leaves the parties with many unresolved questions: Why did the entire period qualify as one (or multiple) eligible transaction(s)? Why were the total charges from MISO equivalent to the costs Owensboro "incur[red] to deliver" isolated purchases of electricity on three occasions to the MISO/Louisville Gas border? Are Owensboro's needs or reasonable actions relevant? To what extent? *See* Schedule at 2, App. 35. These questions leave the parties in a difficult position moving forward.

III.

What is the Commission to do on remand?

A.

Begin with the "when" question.  Are Owensboro's reservations of transmission rights from MISO "transaction[s]" "in which [Owensboro] [1] purchase[d] electricity . . . [2] for delivery" to its facilities?  Paying MISO in exchange for transmission rights seems like a "transaction" in any normal sense of the word.  And on at least a few occasions, Owensboro undisputedly "purchased electricity" within the MISO service territory "for delivery" to its facilities.

The sticking point is how many transactions there were.  One could say that the initial reservation of transmission rights on February 1, 2018, began a transaction that will remain ongoing until Owensboro cancels its rights or the five-year reservation ends.  But maybe Owensboro and MISO signed renewable three-month contracts and each renewal triggered a new transaction.  Or maybe MISO has monthly pay periods, *see* Compl., App. 12, and maybe each time Owensboro pays the latest fee, a new transaction starts.

Maybe the answer is none of the above.  The point is that when one transaction stops and another one starts is unclear.

Why does this hairsplitting matter?  Owensboro bought electricity from within the MISO service territory for delivery on three days in the summer of 2018 (two in July; one in September).  At other times, it "purchased electricity" from Big Rivers that was not "for delivery," but instead lay in reserve.  Order at 61,564–65.  If a transaction began on February 1 and is still running, then there would seem to be only one transaction, which would be eligible for credit in its entirety.  If each month was a transaction, by contrast, then there would be eight transactions between February and September, two of which (July and September) would be eligible for credit.  If every two months were a transaction, then there would be four transactions, and so on.  Depending on how much Louisville Gas must credit Owensboro for each eligible transaction (*see infra* Part III.B), the scope of the word "transaction" could matter a great deal.

At least from our view, this is where the analysis gets trickier and the text might leave the Commission with some further work to do.  Nothing in the contract seems to clarify the scope of a transaction.  We know that MMD Transactions must either "source[] in the [MISO] and sink[] in [Louisville Gas's] control area" or vice versa.  Schedule at 1, App. 34.  In other words, the "location of the generator(s) (source)" and the "ultimate load" or destination (sink) must be in separate service territories.  *See Open-Access Same-Time Info. Sys. and Standards of Conduct*, 83 F.E.R.C. ¶ 61,360, p. 62,453 (1998).  That does not move the ball forward.

Sometimes textual analysis only narrows the field of reasonable interpretations, leaving a few still on the table.  Antonin Scalia & Bryan A. Garner, *Reading Law* xxviii (2012).  A straightforward examination of the text suggests that the meaning of "transaction" and "purchases electricity . . . for delivery" is plain at a general level, but the Commission may need more information to *apply* the terms to the facts before it.  *See State Farm Mut. Auto Ins. Co. v. Slusher*, 325 S.W.3d 318, 322 (Ky. 2010).  The intention of the parties when they signed the contract would then become crucial.  *Frear*, 103 S.W.3d at 106.  This would be a question of fact.  The agency could consult the contract's purpose-related statements, along with evidence outside the four corners of the contract (known as "parol evidence")—including prior dealings of the parties, as well as industry practice and terminology—to figure out how these terms apply to the facts presented.  *Reynolds Metals Co. v. Barker*, 256 S.W.2d 17, 19 (Ky. 1953).

B.

The next issue is the "amount" of credit Louisville Gas owes for each eligible transaction.  *See* Schedule at 2, App. 35.  Previously, the Commission avoided this question.  The agency ordered Louisville Gas to provide credit to Owensboro in "an amount equal to the MISO charges for *th[e] transmission reservation . . .* with interest."  Order at 61,563 (emphasis added).  But it never acknowledged that the contract's language ("[c]harges . . . incur[red] to deliver such purchased electricity") might not be categorically synonymous with the charges Owensboro incurred to reserve transmission rights (which seem to remain the same whether electricity is purchased for delivery or not).[3]  Schedule at 2, App. 35.  If the two metrics are not the same, a

---

[3]Of course, these reservation costs may indeed be part (or all) of the "[c]harges . . . incur[red]."

question of fact exists over how much Owensboro incurred in *each particular* eligible transaction to deliver bought electricity.  The Commission, of course, is best equipped to conduct such an investigation.  What it may not do is equate the two metrics without explanation.  *State Farm*, 463 U.S. at 56–57.

## C.

There is one other contract provision relevant to this dispute, which conditions certain credits on whether MISO and Louisville Gas offered "corresponding services."  *See* Schedule at 3, App. 36.  We express no view on the Commission's interpretation of this provision—that firm and non-firm services are "corresponding."  Louisville Gas never mentioned the provision in its request for rehearing, so the matter is beyond our jurisdiction.  *See* 16 U.S.C. § 825*l*(b) (limiting appellate jurisdiction to the "objection[s] . . . urged before the Commission in [an] application for rehearing"); *Ky. Utils. Co. v. FERC*, 766 F.2d 239, 241 & n.1, 248 (6th Cir. 1985).  We acknowledge only that the Commission is free to reevaluate that interpretation on remand.

\*          \*          \*

The Commission must decide Louisville Gas's obligation to provide credit to Owensboro based on the text of the contract and relevant legal principles.  Once the agency determines what the parties intended the scope of a transaction to be, it should then interpret the "how much" language consistent with Kentucky contract law.  The Commission can then order Louisville Gas to provide credit in the appropriate amount for each eligible transaction.

## IV.

Contracts call for contract analysis.  That is precisely what the Commission needs to do.  We grant the petition for review, vacate the order below, and remand to the Commission for further proceedings consistent with this opinion.